**Ellen S. GOODMAN, Plaintiff,**

v.

**S & A RESTAURANT CORPORATION, Defendant.**

Civ. A. No. J90–0345(L).

United States District Court, S.D. Mississippi, Jackson Division.

March 17, 1993.

—————

Julie Sneed Muller, Phelps Dunbar, Jackson, MS, for defendant.

Steven Mark Wann, Maxey, Pigott, Wann & Begley, Jackson, MS, for plaintiff.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

Plaintiff Ellen S. Goodman brought this action seeking to recover medical expenses which she claims are due her in accordance with insurance coverage offered to employees by her former employer, Steak and Ale Restaurant, a dining establishment located in Jackson, Mississippi. Plaintiff contends that though she requested insurance coverage at or shortly after she became employed by Steak and Ale, defendant S & A Restaurant Corporation (S & A), the owner of Steak and Ale and the sponsor, fiduciary and administrator of the insurance plan at issue, wrongly denied her claim for health care benefits based on its arbitrary finding that she never enrolled for coverage. The case is presently before the court on the motion of defendant S & A for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff has responded to the motion and the court has reviewed the memoranda of authorities together with attachments submitted by the parties. The court concludes, having considered all relevant evidence submitted by the parties, that S & A did not abuse its discretion in finding that Goodman failed to enroll for insurance coverage and that she was therefore precluded from recovering insurance benefits.

## I. BACKGROUND FACTS

Defendant S & A maintained for the benefit of Steak and Ale employees an employee benefits insurance plan which was self-funded by S & A. Under the plan's enrollment procedures, Steak and Ale employees who desired to participate in the program could enroll for coverage at any time within the first thirty-one days of their employment by simply indicating on the insurance section of their employment form that they wanted insurance coverage and authorizing payroll deductions to pay the premiums for their coverage. If, after the first thirty-one days of employment, an employee was desirous of securing coverage, she was required to apply for coverage by filling out a "late enrollment form." Coverage under late enrollment was not automatic, but rather depended upon the employee's submission of evidence of good health, which was accomplished by the completion of an "Evidence of Insurability" form. Regardless of the method of enrollment for coverage, coverage would begin for an employee electing coverage three months after the employee's date of hire.

When she was hired by Steak and Ale on October 20, 1988, Goodman completed an employment form. Though she did not indicate on the employment form at that time whether she wished to participate in the S & A insurance program, according to plaintiff, within a few days of hire, she filled out what she termed a late application or enrollment form requesting health benefits and was advised that her coverage would commence following a ninety-day probationary period. Plaintiff maintains that after the expiration of the probationary period, she inquired regularly of Steak and Ale management personnel about her enrollment and was told that the matter of her insurance had been taken care of and that she was covered. Following an automobile accident on July 11, 1989 which resulted in her hospitalization, however, plaintiff learned that no enrollment form had ever been submitted for her and that she was not covered by S & A's health benefit plan.

## II. PROCEEDINGS

Plaintiff retained an attorney and through counsel, attempted to secure payment of medical benefits under the S & A plan, taking the position that she had, in fact, completed an application or enrollment form and was therefore entitled to insurance coverage. By letter to plaintiff's counsel dated June 27, 1990, S & A declined payment of plaintiff's claim, advising that as there was no evidence to indicate that plaintiff had enrolled in S & A's insurance program, S & A could not provide coverage for her. Plaintiff filed this action against S & A on July 10, 1990, alleging that S & A had wrongly refused payment of her claim and had breached its fiduciary obligations under the Employee Retirement and Income Security Act (ERISA), 29 U.S.C.

§ 1001 *et seq.*,[1] and seeking to recover past and future medical benefits which she contends were payable under S & A's plan or damages consisting of the benefits to which she claims she would have been entitled had S & A properly enrolled her for coverage.

By agreement of the parties, the court entered an order on December 13, 1990 directing that this action be stayed to allow plaintiff to file a formal claim for benefits with S & A.[2] In accordance with the terms of the plan, plaintiff filed a claim with ALTA Health Strategies, Inc. (ALTA), a company which S & A had retained to perform day-to-day administrative services.[3] ALTA denied plaintiff's claim, finding that there was no record that she had ever applied for coverage under the plan and that, since she was not a participant in the plan, she was thus ineligible for recovery of medical benefits. Plaintiff appealed ALTA's denial of benefits to S & A, which likewise concluded that she had never enrolled for coverage under S & A's insurance plan.

After S & A's denial of plaintiff's appeal, litigation in this forum resumed. Upon cross motions of the parties to determine the applicable standard of review, this court concluded that inasmuch as S & A's decision to deny benefits was based solely on its factual finding that the plaintiff did not enroll for insurance coverage, an abuse of discretion standard applied. Once that issue was resolved, S & A moved for summary judgment, contending that the undisputed record evidence demonstrated that it did not abuse its discretion in denying plaintiff's claim for health care benefits. After the issues on that mo-

tion were fully briefed by the parties, plaintiff advised the court that she had acquired new evidence concerning her claim and requested a stay of this litigation in order that she might have the opportunity to submit that evidence to S & A for its consideration. Over defendant's objection, the court acceded to plaintiff's request and· on June 23, 1992, ordered a continuance of this cause. Plaintiff's request for reconsideration by S & A based on the newly acquired evidence, however, proved fruitless, for S & A, after reviewing the evidence and conducting additional investigation, reaffirmed its decision to deny benefits. S & A subsequently filed a supplemental motion for summary judgment, to which the plaintiff has responded. The court is now in a position to rule on S & A's motions.

### III. S & A'S MOTION FOR SUMMARY JUDGMENT AND SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT

In its motion for summary judgment, S & A maintains that its decision to deny plaintiff's claim for benefits was not an abuse of discretion. It asserts that the evidence with which it was presented in connection with her claim, though in certain respects equivocal, fully justified its finding that the plaintiff never submitted any kind of insurance enrollment form and its consequent conclusion that plaintiff never became a participant in the S & A insurance plan. In her response to defendant's motions, plaintiff purports to acknowledge that the issue before the court is whether S & A abused its discretion in find-

---

1. Plaintiff's ERISA claim was asserted as an alternative to state law claims of negligence, promissory estoppel, negligent misrepresentation, fraud and intentional infliction of emotional distress arising from defendant's alleged failure to process her application for health insurance in a timely manner. As damages for defendant's alleged state law violations, plaintiff sought past and future medical expenses, together with punitive damages and damages for mental anguish. Following a defense motion for partial summary judgment, this court, on November 20, 1990, entered a memorandum opinion and order holding that plaintiff's state law claims were preempted by ERISA and striking plaintiff's claims for extracontractual and punitive damages, as well as her request for a jury trial.

2. The parties agreed that plaintiff was required to exhaust available administrative remedies.

3. The plan documents reveal that S & A "retained ALTA Health Strategies, Inc. to handle day-to-day administration of medical benefits," and that claims were to be filed with and an initial claims decision made by ALTA. However, S & A was denominated as the plan administrator and was granted "all discretionary authority and control over the operation and administration of the plan," including authority to "make[ ] all final decisions concerning medical coverage and benefit amounts." Consistent with this authority, the plan established a process for appealing to S & A a denial of benefits by ALTA.

ing that she never submitted an application for insurance with S & A. She submits, however, that because the question of whether she ever applied for insurance coverage is purely factual and turns on the resolution of credibility issues and conflicting evidence, then this court cannot decide that dispositive issue on summary judgment.

As an initial matter, it is apparent to the court that plaintiff misapprehends the court's function in this case. The issue which the court must decide is *not* whether the plaintiff, in fact, submitted an enrollment card or otherwise applied for coverage. Were that the issue, then the court would likely agree that summary judgment is inappropriate. But the issue for the court to decide is whether the defendant *abused its discretion* in finding that the plaintiff did not submit an enrollment form or otherwise apply for insurance coverage. That is, the court must determine whether the administrator reached a reasonable and impartial decision in light of the evidence with which it was presented. So, even were the court to assume that plaintiff did, as she claims, take all the steps necessary for securing insurance coverage, she would not be entitled to relief from this court unless the court were to find that S & A abused its discretion in reaching a contrary conclusion.

Thus, in this case, as contrasted with the typical summary judgment scenario, it matters not that there may be conflicting evidence concerning the ultimate historical facts which underlie plaintiff's claim. Indeed, that is quite the point of the administrator's claim resolution function. Where, as here, an ERISA claim determination depends upon the resolution of facts, it can be presumed that there will be conflicting evidence, as well

as, perhaps, issues of credibility concerning the "facts." But it is the administrator which is called upon in the first instance to evaluate the evidence and resolve any conflicts or credibility issues. The court performs a review function, and its role is limited to determining whether the administrator exercised its decision-making prerogative in a reasonable and impartial manner. *See Denton v. First Nat'l Bank,* 765 F.2d 1295, 1298–99 n. 5 (5th Cir.1985) (inquiry for trial court must always be whether trustees acted in an arbitrary and capricious manner, not what district court would have done had it been confronted with the evidence placed before the committee *de novo;* exhaustion of remedies "is such an important part of ERISA" because court must look to reasonableness of committee's decision); *Offutt v. Prudential Ins. Co.,* 735 F.2d 948, 950 (5th Cir.1984) (application of arbitrary and capricious standard "is not an abdication of traditional judicial responsibility to review the actions of fiduciaries; but, in accordance with federal labor policy, the arbitrary-or-capricious standard does limit review to prevent excessive judicial intervention in trust operations."); *Dennard v. Richards Group, Inc.,* 681 F.2d 306, 313 (5th Cir.1982) (arbitrary and capricious standard "prevents excessive judicial intervention in trust operations"); *cf. Pierre v. Connecticut Gen. Life Ins. Co.,* 932 F.2d 1552, 1559, 1562 (5th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 453, 116 L.Ed.2d 470 (1991) ("courts simply cannot supplant plan administrators, through *de novo* review, as resolvers of mundane and routine fact disputes;" rather, "abuse of discretion standard best balances the need to respect plan administrator's factual determinations and the need to protect beneficiaries by providing some judicial review of those decisions.")[4]

---

4. Whereas the Fifth Circuit had once referred to the applicable standard of review as arbitrary and capricious, *see, e.g., Offutt v. Prudential Ins. Co.,* 735 F.2d 948, 950 (5th Cir.1984), the court has recently clarified, in response to the Supreme Court's decision in *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), that the standard of review for an administrator's factual determinations is abuse of discretion, rather than arbitrary or capricious, *see Wildbur v. Arco Chem. Co.,* 974 F.2d 631, 635 n. 7 (5th Cir.1992) ("[A]fter *Firestone,* we have usually described this more defer-

ential alternative to *de novo* review as review under an 'abuse of discretion' standard."). *See also Pierre v. Connecticut Gen. Life Ins. Co.,* 932 F.2d 1552 (5th Cir.1991). The court, though, has suggested that there is no substantive difference in these standards. *See Wildbur,* 974 F.2d at 635 n. 7 ("we detect only a semantic, not a substantive difference" in the abuse of discretion and arbitrary and capricious labels); *Salley v. E.I. DuPont de Nemours & Co.,* 966 F.2d 1011, 1014 (5th Cir.1992) ("In applying the abuse of discretion standard, we analyze whether the plan administrator acted arbitrarily or capriciously.");

In summary judgment parlance, the plaintiff must demonstrate the existence of a genuine dispute of *material* fact. *See* Fed. R.Civ.P. 56. A material fact is one "that might affect the outcome of the lawsuit under the governing substantive law." *Phillips Oil Co. v. OKC Corp.*, 812 F.2d 265, 272–73 (5th Cir.), *cert. denied*, 484 U.S. 851, 108 S.Ct. 152, 98 L.Ed.2d 107 (1987). The facts which are material here, in the sense that they might affect the outcome of the case, are the fact of the administrator's decision and the evidence relied on by the administrator in reaching its decision. Accordingly, contrary to plaintiff's ardent contention, summary judgment is not inappropriate simply because the issue addressed and decided by the administrator was factual in nature and required that the administrator choose between conflicting versions of facts or to make judgments about whom to believe. Rather, in this context, to avoid a properly supported motion for summary judgment, Goodman must demonstrate that in making those choices and judgments, the administrator acted without any substantial basis, i.e., abused its discretion (and/or that the administrator failed to render a decision that was impartial).[5]

## A. ABUSE OF DISCRETION STANDARD

The Fifth Circuit has indicated that the analysis of an administrator's interpretation of an employee benefit plan requires that the reviewing court follow a two-step process. First, the court must determine the legally correct interpretation of the plan provision at issue. If the court concludes that the administrator correctly interpreted the plan, the court's inquiry ends.[6] If, however, the administrator did not accord the plan the legally correct interpretation, the court must decide whether the administrator abused its discretion, giving consideration to three factors: "(1) the internal consistency of the plan under the administrator's interpretation, (2) any relevant regulations formulated by the appropriate administrative agencies, and (3) the factual background of the determination and any inferences of lack of good faith." *See Wildbur v. Arco Chem Co.*, 974 F.2d 631, 638 (5th Cir.1992); *Jordan v. Cameron Iron Works, Inc.*, 900 F.2d 53 (5th Cir.), *cert. denied*, 498 U.S. 939, 111 S.Ct. 344, 112 L.Ed.2d 308 (1990); *Batchelor v. International Bhd. of Elec. Workers Local 861 Pension & Retirement Fund*, 877 F.2d 441 (5th Cir.1989); *Dennard v. Richards Group, Inc.*, 681 F.2d 306 (5th Cir.1982). Though the Fifth Circuit in *Wildbur*, and its other cases applying this two-step abuse of discretion analysis, has not expressly limited application of that analysis to decisions of plan interpretation, an implicit limitation to such decisions is manifest from the nature of the inquiry required. The analysis dictated by the court speaks in terms of plan "interpretation" and "construction" and requires that the reviewing court consider issues which are only relevant to questions of plan interpretation.[7]

---

*Penn v. Howe–Baker Engs., Inc.*, 898 F.2d 1096, 1100 n. 2A (5th Cir.1990) ("[T]he way to review a decision for abuse of discretion is to determine whether the plan committee acted arbitrarily or capriciously.").

5. In addition to her contention that there are disputes of material fact concerning whether she submitted an enrollment form, plaintiff suggests that there is an additional material fact in this case, specifically that the plan administrator, S & A, operated under a potential conflict of interest. Of course, the existence of a conflict of interest is a material fact in the court's analysis of plaintiff's claim. *See infra* at 1146–48. But given the state of the record in this case and for the reasons discussed *infra*, the court is unable to conclude that the "fact" of a conflict precludes summary judgment.

6. The Fifth Circuit identified three factors for the district court to consider in determining whether an administrator's interpretation of a plan was legally correct: "(1) whether the administrator has given the plan a uniform construction, (2) whether the interpretation is consistent with a fair reading of the plan, and (3) any unanticipated costs resulting from different interpretations of the plan." *Wildbur*, 974 F.2d at 638 (quoting *Batchelor*, 877 F.2d at 445–48).

7. *See supra* note 6. That the analysis is not applicable to fact findings is also indicated by the Fifth Circuit's in *Wildbur* having found inapposite two cases from other circuits, *Sandoval v. Aetna Life & Casualty Ins. Co.*, 967 F.2d 377 (10th Cir.1992), and *Perry v. Simplicity Eng'g Div. of Lukens Gen. Indus., Inc.*, 900 F.2d 963 (6th Cir.1990), "since [those cases] involved district review of a plan administrator's determination of questions of historical facts." *Wildbur*, 974 F.2d at 642.

Under this analysis, a district court's determination that an administrator's interpretation is plausible will not suffice. Rather, the court must determine whether the administrator's interpretation was legally "correct" or "right" and, if not, then the court must decide whether the administrator's actions were arbitrary and capricious, in light of the court's determination as to the correct interpretation of the plan. *See Dennard,* 681 F.2d at 314. The analysis simply does not lend itself to application in cases where the issue is whether the administrator abused its discretion in making *factual findings.*[8] In the case at bar, there is no question about whether S & A correctly or incorrectly interpreted any terms of the plan as no issue of policy interpretation was submitted to, considered by or decided by S & A. The issue instead was solely one of fact: Did Ellen Goodman at any time prior to her July 11, 1989 accident enroll for or apply for insurance coverage under the S & A plan?[9] Thus, the court need not engage in the two-step analysis in evaluating S & A's decision for an abuse of discretion. Rather, the court's function is to review the relevant evidence to determine whether S & A's denial was reasonable and impartial. The task is perhaps somewhat more amorphous than would be the review of plan interpretation decisions since there are no specific criteria for the court to address when evaluating fact-based decisions. But the goal is the same: to determine, taking account of all relevant evidence, whether S & A's denial of Goodman's claim for benefits was supported by the evidence it considered and was reasonable and impartial.

## B. RELEVANT EVIDENCE

■ A question has been presented in this case as to what evidence is "relevant," in light of the issues presented, and what evidence may therefore be considered by the court. Defendant submits that a practical implication of the court's ruling that an abuse of discretion standard of review applies is that the court is "strictly limited to the evidence before the Plan Administrator at the time it made its decision to deny plaintiff's claim." Plaintiff, however, citing the Fifth Circuit's *Wildbur* opinion, suggests that this court is free to accept and consider evidence which was not before the administrator. Plaintiff indicates two types or categories of evidence which she believes the court could and should consider, the first consisting of evidence relating to the facts underlying her claim, and the second, relating to an alleged conflict of interest under which she contends S & A operated.

### 1. Evidence of Historical Facts

The Fifth Circuit in *Wildbur* made clear that certain types of evidence, extraneous to the administrative record, may be considered by a court conducting the two-step abuse of discretion analysis. However, the *Wildbur* court explicitly admonished that the district court reviewing an administrator's decision for abuse of discretion may not consider any evidence relating to *historical facts* which was not presented to the administrator, stating that while some types of evidence may be considered by the court,

[t]his is not to say that a litigant dissatisfied with an administrator's benefit determination is free to disregard the evidence before the administrator and relitigate in court the historical facts surrounding a claim. *We have long held that in conducting review under an abuse of discretion standard, a district court should evaluate*

---

8. Findings of fact are obviously not nearly as susceptible to characterization as "right" or "wrong," or "correct" or "incorrect" as are questions of contract interpretation.

9. In ruling that an abuse of discretion standard of review applied to S & A's findings in this case, this court observed that S & A's decision was not based upon any interpretation ... of [plan] provisions although language from these provisions such as that referring to premium deductions was later utilized by S & A in support of

its position. Neither was interpretation of the term "enrolled" involved. S & A's contention, and the basis for denial of the claim, is simply that Goodman never submitted a late enrollment form as no such form or any record thereof was revealed by its investigation, though Goodman claims to have submitted such a form. The only question is whether Goodman submitted an application for insurance coverage.
*Memorandum Opinion,* at 5 (Dec. 13, 1991).

*the administrator's fact findings regarding the eligibility of a claimant based on the evidence before the administrator,* assuming that both parties were given an opportunity to present facts to the administrator. *See Denton v. First National Bank of Waco,* 765 F.2d 1295, 1304 (5th Cir.1985); *Lowry v. Bankers Life & Casualty Retirement Plan,* 865 F.2d 692, 694 (5th Cir.), *reh'g denied,* 871 F.2d 522, *cert. denied,* 493 U.S. 852, 110 S.Ct. 152, 107 L.Ed.2d 111 (1989). Yet, in these and other opinions, we have also explained how other evidence, *not dealing with historical facts underlying the benefit determination,* and therefore not usually in the administrative record, was relevant under our abuse of discretion analysis.

*Wildbur,* 974 F.2d at 638–39 (emphasis supplied).[10]

Plaintiff argues that this court may not grant summary judgment, insisting that she must be given the opportunity to present evidence *at trial* regarding the facts so that the court might then be in a position to consider and resolve the disputed issues of fact concerning whether she enrolled for coverage. However, plaintiff has not actually submitted to the court nor has she identified any evidence relating to the historical facts underlying S & A's benefit determination in addition to that which was presented to S & A. She has pointed to no *additional* infor-

mation which she contends the court should or could consider in evaluating her claim.[11] She merely contends that this court should have the benefit of a trial so that it can evaluate for itself witness' credibility and any conflicting evidence. The court reiterates that its task in this case is not to determine whether Goodman did enroll for coverage but whether S & A abused its discretion in finding that she did not. And, as *Wildbur* confirms, the court must evaluate S & A's fact finding on this issue solely on the administrative record. Thus, to the extent that plaintiff is requesting that this court go beyond the administrative record and consider evidence relating to the facts underlying her claim other than that which was, or which could have been presented to S & A during its claims evaluation process, the court must decline her request. Because there is no dispute as to what evidence was considered by the plan administrator, it would serve no useful purpose to delay a decision in this case pending a trial for the sole purpose of considering evidence of the historical facts since the court's review of such facts is limited to the administrative record.

## 2. Conflict of Interest

In the case *sub judice,* however, plaintiff maintains that S & A operated under a possible conflict of interest, which directly suggests an improper motive in its denial of her claim and calls into question its good faith, or

---

**10.** The court in *Wildbur* specifically held that "a district court is not confined to the administrative record in determining whether, under our analytical framework, a plan administrator abused his discretion in making a benefit determination." *Wildbur,* 974 F.2d at 639. It did so upon recognizing that under the two-step abuse of discretion analysis prescribed by the court, there will often be issues as to which no evidence would be expected to be found in the administrative record but the court, because it must address those issues, must be permitted to consider evidence relating to those issues. For example, since an administrator's decision involving interpretation of terms of a plan under the two-step analysis requires consideration of whether the administrator has given the plan a uniform construction, consideration of that issue might require a court "to evaluate benefit determinations other than the one under scrutiny;" or the determination of whether an interpretation results in unanticipated costs may require the court to "review what costs were anticipated and what costs may flow from the challenged interpretation."

*Id.* at 638. Since no issue of plan interpretation is involved in the case at bar, there would be no need for the court to consider evidence of this nature.

**11.** Goodman alludes to an affidavit which she included in her response to defendant's summary judgment motion in which she set forth her version of events. In the briefing on that motion, defendant contended that the court could not consider her affidavit inasmuch as it was not included in the administrative record. It appears, however, that in connection with her subsequent request for reconsideration by S & A in July 1992, plaintiff did submit her affidavit and therefore, it was before the administrator. In any event, it is evident that all of the information set forth in plaintiff's affidavit was provided to S & A during the claims evaluation process through letters of counsel stating plaintiff's position and that S & A was therefore well aware of her position when it made its claim denial decision.

lack thereof. Thus, in addition to her suggestion that this court ought to receive extraneous evidence relating to the facts underlying her claim, plaintiff asserts that this court should withhold summary judgment in order that it will have the opportunity at a trial of this case to inquire into the possible conflict of interest and to factor such conflict into its abuse of discretion analysis.

In support of her claim relating to the alleged conflict of interest, plaintiff points out that S & A operated as the plan sponsor and plan administrator, and was denominated as the sole fiduciary under the plan. As plan administrator, S & A was responsible for making final benefits decisions.[12] Yet S & A's insurance coverage was self-funded by S & A, leaving open the possibility for exposure of S & A's general assets if payment of claims in any fiscal year exceeds collected premiums.[13] These facts certainly suggest an apparent conflict of interest. *See Adelson v. GTE Corp.*, 790 F.Supp. 1265 (D.Md.1992) (where group health plan was self-insured by company, and plan administrator was employee benefits committee made up solely of company employees, existence of conflict of interest was self-evident); *Cargile v. Confederated Life Ins. Group Plans*, 748 F.Supp. 874 (N.D.Ga.1990) (in case of self-insured plan, under which benefits were paid out of employer's own assets, conflict of interest existed where individual making benefits determinations was employer's assistant vice president and head of personnel); *Poole v. Seattle–First Nat'l Bank*, 741 F.Supp. 837 (E.D.Wash.1990) (conflict of interest existed where members of employee benefit committee were also active officers of company, served at pleasure of company board of directors and administered self-insured plan in which benefits were paid out of company assets).

According to plaintiff, there are two effects of this apparent potential for bias on the part of S & A: First, it significantly decreases the degree of deference which would otherwise

be accorded an administrator's factual findings, and second, it opens the door to consideration by this court of evidence relating to the conflict of interest. Therefore, plaintiff argues, to grant defendant's motion for summary judgment would deprive the court of the opportunity to delve into the apparent conflict and to apportion the appropriate weight to be given the conflict in deciding whether S & A abused its discretion in its decision regarding plaintiff's claim.

█ It is manifest that an administrator's conflict of interest "must be weighed as a 'factor in determining whether there was an abuse of discretion.'" *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989) (citations omitted). *See also Lowry v. Bankers Life & Cas. Retirement Plan*, 871 F.2d 522, 525 (5th Cir.1989) ("plan administrator's conflict of interest is certainly material to judicial review under our circuit's pre-*Bruch* arbitrary and capricious standard"). The existence of a conflict of interest does not change the standard of review, which remains one of abuse of discretion, *see Salley v. E.I. DuPont de Nemours & Co.*, 966 F.2d 1011, 1014 (5th Cir.1992). (employer, which reserved final authority to authorize or deny benefit payments and which funded plan from operating revenues had apparent incentive to deny benefits; alleged conflict did not change standard of review but was weighed as a factor in determining whether there was an abuse of discretion); but it does alter the manner in which the abuse of discretion standard is applied. The Fifth Circuit has suggested the use of a "sliding scale of judicial review of [an administrator's] decisions ...—more penetrating the greater is the suspicion of partiality, less penetrating the smaller that suspicion is." *Lowry*, 871 F.2d at 525 n. 6. *Cf. Pierre*, 932 F.2d at 1562 (reviewing court should evaluate fact determinations "that reflect a reasonable and *impartial* judgment" of a plan administrator under an abuse of discretion standard)

---

**12.** *See supra* note 3.

**13.** Under the heading, "Method of Funding Benefits," the plan document provides:

The Plan is self-insured by S & A Restaurant Corp. and has been since March 1, 1984. This means that S & A may pay medical and dental claims under the Plan from its general assets. Health benefits are self-funded from accumulated assets and are provided directly from the *plan sponsor* (S & A).

(emphasis added). Thus, in this circuit, " 'less deference [is given] to a decision the more the [administrator's] impartiality can be fairly questioned.' " *Id.* (quoting *Van Boxel v. Journal Co. Employees' Pension Trust,* 836 F.2d 1048, 1052–53 (7th Cir.1987)). Thus, the court must consider what it views as an apparent self-interest on the part of S & A in determining whether S & A abused its discretion in denying plaintiff's claim for benefits.[14]

■ Moreover, where an issue is raised concerning an administrator's conflict of interest and possible bias resulting from that conflict, the court may consider evidence which was not presented to the administrator on *that* issue. Indeed, the court in *Wildbur* held that where an issue is raised concerning an administrator's alleged lack of good faith, evidence which might tend to demonstrate such a lack of good faith would be relevant and admissible, even though such evidence would likely not be found in the administrative record.[15] Plaintiff is thus correct in her assertion that the existence of a conflict of interest and the potential for bias inherent in that conflict would be a proper subject for proof in this case. *See Lowry,* 871 F.2d at 525 (conflict of interest allegations may in-volve questions of fact). However, plaintiff has not suggested how the postponement of a decision in this case pending a trial might alter the court's analysis of her claim. She has not so much as intimated what, if any, evidence she might present if a trial were held. The facts relating to the alleged conflict of interest are in the record and undisputed and will not change if a trial is ordered. There is no interest to be served by awaiting trial—especially given that the trial would be non-jury solely in order that this court might then decide how much, if any, deference should be accorded S & A's findings. Rather, sufficient information is before the court for the court to conclude that due to the nature of the conflict under which S & A operated, its findings are entitled to little deference by this court. Nevertheless, even giving its findings little deference, the court is unable to conclude that S & A abused its discretion in finding that plaintiff did not enroll for insurance coverage.

## C. ANALYSIS

■ It is undisputed that when plaintiff filled out an employment form at the time she was hired, she did not complete the insurance section of the form, which was to

---

**14.** Defendant suggests that unless the court determines that its decision was wrong, the court need not concern itself with any conflict of interest it may have had. *See Brown v. Blue Cross & Blue Shield of Ala., Inc.*; 898 F.2d 1556, 1558 (11th Cir.1990), *cert. denied,* 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991) ("[i]t is fundamental that the fiduciary's interpretation first must be 'wrong' from the perspective of *de novo* review before a reviewing court is concerned with the self-interest of the fiduciary."). While that may be the case when the issue is one of plan interpretation, where the court's review involves evaluation of an administrator's factual findings, it is not reasonable to separate the two inquiries. The court cannot avoid considering any self-interest in deciding whether the administrator's decision of fact was an abuse of discretion.

**15.** Specifically, the court in *Wildbur* stated:

If a reviewing court concludes that the administrator's interpretation of the plan was incorrect and proceeds to the second step of our abuse of discretion analysis, three additional factors become relevant. One of these (which really involves two separate questions), *the factual background of the determination and any*

*inferences of a lack of good faith, may, at least on the question of good faith, require the court to review evidence that was not presented to the administrator.* This is especially true because we have instructed district courts to evaluate inferences of lack of good faith on a sliding scale.

We note that "the arbitrary and capricious standard may be a range, not a point. There may be in effect a sliding scale of judicial review of trustees' decisions ...—more penetrating the greater is the suspicion of partiality, less penetrating the smaller that suspicion is ...".

*Lowery v. Bankers Life & Casualty Retirement Plan,* 871 F.2d 522, 525 n. 6 (5th Cir.), *cert. denied,* 493 U.S. 852, 110 S.Ct. 152, 107 L.Ed.2d 111 (1989).

*Wildbur,* 974 F.2d at 638 (emphasis added). Because the question of an administrator's lack of good faith may arise as readily in cases involving factual findings as in cases involving plan interpretation, the *Wildbur* court's observations regarding relevant evidence on the issue of good faith are applicable, even though *Wildbur* 's two-step abuse of discretion analysis does not strictly apply in a case involving judicial review of an administrator's factual findings.

be completed by employees who "wish to participate in S & A's insurance program." [16] Plaintiff claims, however, that even though she did not initially request insurance coverage, she did, within a few days of becoming employed by Steak and Ale, fill out an enrollment form requesting coverage. Plaintiff submits that despite her presentation to S & A of ample evidence to substantiate her claim that she enrolled for coverage, S & A categorically and arbitrarily rejected as unbelievable all of the evidence favorable to her position and, among other tactics, seized on illusory inconsistencies and unfounded and/or irrelevant bases to challenge the testimony which she presented. Upon a thorough review of the administrative record in this case, however, the court is convinced that S & A's decision was not an abuse of discretion and was, moreover, far more likely a "correct" than an "incorrect" decision.

Upon being notified that Goodman had been involved in an automobile accident and was claiming entitlement to insurance coverage, S & A began conducting an investigation into Goodman's claim. S & A checked its own files and found that it had no record of plaintiff's ever having enrolled for coverage nor any record of there ever having been any deductions from plaintiff's paycheck for premiums for coverage. Lacking any record of an enrollment by plaintiff, S & A benefits administrator Pam Halstead communicated with Danie Ard, a Steak and Ale manager at the time of plaintiff's employment, to determine whether the restaurant had any record which would substantiate plaintiff's claim that she had requested coverage. Ard, the record reflects, reported that there was no enrollment form or "anything like that" in Goodman's employment file at the restaurant. On October 2, 1989, during its investi-

gation, S & A claims personnel spoke with Jeanne Resua, one of Goodman's coworkers, who recalled that she had been in the office at the same time as Goodman and Tracey Downing, Steak and Ale's general manager, sometime before Goodman's accident. Resua thought that she remembered Downing's asking plaintiff, "You did get on the insurance, didn't you?" to which Ms. Goodman responded, "Yes."

An S & A benefits coordinator, Sherilyn Hancock, also talked with Tracey Downing to learn what Downing knew about whether plaintiff had enrolled for insurance coverage. According to notes taken by Hancock of an October 3, 1989 conversation with Downing, Downing advised that she knew that Goodman had wanted insurance coverage and initially stated that she thought that Goodman had applied for coverage when she was hired. Upon being informed by Hancock that the insurance section of Goodman's employment form was blank, however, Downing said she thought the plaintiff had signed up on late enrollment. Ultimately, Downing said she thought she had seen an insurance booklet with the plaintiff's name on it and that the booklet was the reason she thought that Goodman was covered. However, Downing denied that she had ever told Goodman that she had insurance coverage.

Based on its these findings and more specifically, the absence of verifiable evidence that she had signed up for or paid for insurance coverage, S & A indicated to Goodman that her claim would not be paid. Thereafter, plaintiff initiated a formal claim for benefits. The only evidence submitted by plaintiff at that time in support of her claim was her own version of events—claiming that she had enrolled for coverage within a few days

**16.** The section provided *in toto*:

INSURANCE ENROLLMENT
COMPLETE THIS SECTION IF YOU WISH TO PARTICIPATE IN S & A'S INSURANCE PROGRAM. FAILURE TO COMPLETE ALL LINES WILL RESULT IN A DELAY IN COVERAGE.
Date Employed ——————— Beneficiary ——————— Beneficiary Relationship ———————

Do you wish to participate in the S & A Group Health and Life Insurance Plan as provided Hourly restaurant employee?
——————— Yes      ——————— No

I authorize my employer to deduct from my earnings until further notice, my contributions for insurance under the policy issued by the Insurance Company.
Employe Signature ——————————————————      Unit ——————————————————

of being hired—and a March 1990 affidavit signed by Tracey Downing, in which Downing stated that "[s]ometime after [the] July 11, 1989 automobile accident involving Ms. Goodman, I received an insurance booklet from S & A Restaurant Corporation's Group Benefit Plan outlining coverage for Ms. Goodman." S & A found Downing's recollection to be inconsistent with its established enrollment procedures, which suggested that no insurance booklet would have been sent to plaintiff since there had been no deductions from her paycheck for premium payments, and therefore "discounted" Downing's affidavit. And, reiterating the absence of documentary evidence that she had enrolled for coverage, S & A denied plaintiff's claim for benefits. Two years later, in June 1992, plaintiff moved for reconsideration of S & A's denial decision, and with her motion for reconsideration, presented to S & A an affidavit executed by Danie Ard on June 9, 1992, which stated as follows:

> At the time of Ellen Goodman's employment with S & A and at the time of her automobile accident which is the subject matter of this litigation, I was one of two managers at the Jackson restaurant who operated under the direction of the general manager, Tracey Downing. I was the manager of the "front of the house," meaning that I was in charge of hiring and firing waitresses and waiters, satisfaction of customers, eating areas, the bar, etc.

> I handled Ellen Goodman's employment application and hiring in October 1988. At the time of Ellen's employment, I informed her not to fill out the insurance portion of the employee enrollment form, since she had 30 days to decide whether or not she wanted insurance. Within a very few days, Ellen requested insurance coverage by filling out a separate enrollment form. The form which Ellen filled out was a standard enrollment form, and not a late enrollment form, because it was filled out within 31 days of her employment. Late enrollment forms are those which are filled out more than 31 days after an employee's employment.

> Ellen Goodman was informed that she would have coverage three months after the date of her employment.

> The enrollment form which was filled out by Ellen Goodman had four copies. One copy was supposed to be given to the employee at the time it was filled out. The top two copies were to be torn off and sent to the corporate entity. It was Tracey Downing's job to send those copies to the appropriate persons. The fourth copy went into the unit file at the local restaurant.

> After the automobile accident which is the subject of this litigation, Ellen called me and asked me to confirm that she had coverage. I looked in the unit file and the yellow portion of her enrollment form was properly filed there. After Ellen hired an attorney to help her collect medical benefits, I went to the unit file again to make a copy of her enrollment form to send a copy to her. When I went back to the file to do so, the yellow copy of her enrollment form was gone.

> After Ellen filled out her enrollment form and gave it to Tracey Downing, it was Tracey's job to submit the enrollment form to the appropriate persons at corporate headquarters. There was a tray for mail and payroll information where the top two copies of Ellen's enrollment form should have been placed. Tracey Downing was supposed to send copies of any enrollment forms to the corporate headquarters at payroll time, which was twice a month.

> The Jackson Steak and Ale was Tracey Downing's first job as a general manager, to the best of my knowledge, and it was not unusual for her to lose paperwork. Tracey would frequently misplace papers or put papers in her briefcase, taking them home instead of properly filing them.

> On at least one occasion before the accident, I heard Tracey Downing tell Ellen that her insurance was "taken care of" or otherwise represent that Ellen had coverage.

Concluding that there existed many "inconsistencies" in Ard's statement and a number of "troubling aspects" of his affidavit, S & A ultimately rejected Ard's affidavit as "unbelievable." S & A considered, *inter alia*, the fact that Ard, though contacted on two previ-

ous occasions about Goodman's claims of coverage with specific reference to the question of whether Steak and Ale had any records to show that Goodman had applied for coverage, made no mention of any enrollment form or missing enrollment form and that he did not then volunteer that he had any personal knowledge that she had ever applied for coverage.[17]

Based on the evidence presented, as described above, it is apparent to the court that S & A had ample basis for its conclusion that plaintiff failed to enroll for insurance coverage. It is undisputed that Goodman did not complete the insurance enrollment section of her employment form at the time she was hired. And neither S & A nor Steak and Ale Restaurant had any verifiable evidence that the plaintiff enrolled for insurance coverage then, or at any other time. Though plaintiff herself advised S & A that she had enrolled for insurance coverage sometime after she was hired, she presented no documentary evidence to substantiate her claim. Plaintiff, according to Ard's affidavit, would have received a copy of her insurance enrollment form when she enrolled for coverage; yet plaintiff presented no such form to S & A in support of her claim for benefits.

In addition to the fact that there was no documentary evidence to demonstrate that plaintiff had enrolled for coverage, it was established that plaintiff never paid any premiums for insurance coverage. In finding that plaintiff had not enrolled for coverage, S & A relied not only on the fact that she never paid any premiums, but also on the fact that Goodman never even inquired as to why no premiums were being deducted from her paycheck. It is uncontroverted that premiums for insurance coverage under the S & A plan were paid by the employees, via payroll deductions, and plaintiff does not dispute that during her eight-month employment with Steak and Ale, she never paid any premiums for insurance coverage, by payroll deduction or otherwise.

Though plaintiff indicated to S & A, through counsel, that she had thought that Steak and Ale paid for coverage so that she did not know to look for deductions from her paycheck, significant evidence contradicted plaintiff's position on this point. First, the record reflects that only two types of forms were utilized by S & A for employees to enroll for or apply for insurance coverage: the insurance section of the employment form, which was to be completed if insurance coverage was elected at the time of hire or within the first thirty-one days of employment, and a "late enrollment form," which was used for employees who decided after their first thirty-one days to apply for insurance coverage. The insurance section of the employment form required that the employee "authorize [the] employer to deduct from my earnings ... my contributions for insurance under the policy issued by the Insurance

---

17. Pam Halstead and Sherilyn Hancock, the S & A benefit coordinator and benefit administrator, respectively, who were responsible for the initial investigation of Goodman's claim, presented affidavits in connection with S & A's reconsideration of plaintiff's claim. Halstead stated in her affidavit that she spoke with Ard on September 29, 1989 and recalled specifically that she asked Ard

> about whether he had a copy of an Enrollment Form indicating that Ms. Goodman had signed up for the health care plan. Mr. Ard responded that he did not have a copy of an Enrollment Form, a Late Enrollment Form or anything like an Enrollment Form. Mr. Ard did not indicate to me that he had ever seen an Enrollment Form for Ms. Goodman nor did he indicate to me that an Enrollment Form was missing from Ms. Goodman's file. In fact, Mr. Ard indicated to me that his knowledge about Ms. Goodman's insurance situation had come strictly from his conversation with Ms. Goodman.

Hancock presented an affidavit in which she stated that after her conversation with Tracey Downing, she communicated with Danie Ard, at Downing's suggestion, to ask Ard whether there was an insurance booklet with Goodman's name on it in the restaurant's files. According to Hancock,

> I asked Mr. Ard to search the restaurant's file drawer for an insurance booklet with Ellen Goodman's name on it. Mr. Ard did so and informed me that he could not locate an insurance booklet in the restaurant's file drawer with Ellen Goodman's name on it. Mr. Ard did not indicate to me that he had seen any documentation regarding health insurance with Ellen Goodman's name on it nor did he indicate to me that any documents were missing from Ms. Goodman's file.

Plaintiff submitted no evidence to the administrator, nor for that matter to this court, to refute these affiants' recollections of their conversations with Ard.

**1152**

Company." And the form for late enrollment stated "coverage will not begin until thirty days after the first deduction from your paycheck." Thus, regardless of the form plaintiff claimed to have filled out requesting insurance coverage, had she filled out any form, she would have been aware that premiums for coverage would be paid by her, via payroll deduction.

Moreover, evidence was presented that all employees of Steak and Ale were advised during an employee orientation that employees who elected insurance coverage were required to pay the premiums for such coverage. Even Danie Ard stated in an affidavit provided to S & A [18] that it was well known that employees were responsible for the payment of premiums for insurance coverage and that this was accomplished by payroll deduction. Furthermore, the record reflects that Steak and Ale was provided with a listing of all employees who were enrolled in the insurance program and whether those employees' premiums were delinquent, and that list was posted on the restaurant bulletin board after every pay period. Tracey Downing verified that the plaintiff's name, to her recollection, never appeared on the listing of employees with health care coverage. All of this information clearly tended to refute the plaintiff's claim that she thought the coverage was employer-funded.[19] And in the court's opinion, S & A, in denying plaintiff's claim for benefits, was reasonable in relying on the fact that during plaintiff's eight-month tenure as an employee of Steak and Ale, no premiums were ever deducted from plaintiff's paycheck.

S & A was further warranted, in the court's opinion, in rejecting Tracey Downing's testimony that she had received an insurance booklet from S & A after plaintiff's July 1989 accident. A review of the enrollment procedures followed by the S & A Employee Benefits Department, as set forth in the claims file, reveals that Hourly Group Medical booklets were sent to covered employees, along with an insurance card and a fact sheet highlighting the employee's effective date of coverage under the plan, *only after two full payroll deductions were made for insurance premiums*. Based on that enrollment procedure, S & A "discount[ed]" Downing's recollection that an insurance booklet had been received for plaintiff, since, according to S & A, no booklet would have been sent for the plaintiff because *no* payroll deductions were ever made for plaintiff. Though plaintiff derides as arbitrary and unjustified S & A's decision to "discount" Downing's recollection about having received an insurance booklet for her, she has presented no evidence challenging S & A's position regarding its enrollment procedures. Further, though she did not change her position regarding the alleged insurance booklet, Downing stated in an affidavit presented to S & A on its reconsideration of plaintiff's claim that "[s]hortly after Ellen Goodman's accident," someone—she did not know who—contacted her to inquire whether Goodman had obtained insurance coverage through Steak & Ale. According to Downing, she "checked all of the records but could not find an enrollment form or any documents relating to Ellen Goodman's coverage." In the court's opinion, S & A's conclusion that Downing was likely mistaken in her recollection about the booklet was certainly rational, in light of its enrollment procedures and given the absence of any payroll deductions from plaintiff's paycheck for premium payments.[20]

The evidence most directly supportive of Goodman's claim that she enrolled for insurance coverage was the June 1992 affidavit of

**18.** After plaintiff procured Ard's June 9, 1992 affidavit, Ard provided an additional affidavit setting forth his criminal history, and stating: "All employees of Steak & Ale were aware that insurance premiums were deducted from their paychecks."

**19.** The court would also note that it seems somewhat odd that plaintiff would not simply have enrolled for the coverage when she was hired if she was in fact under the impression that the coverage was free. Plaintiff has herself indicated that she did not have other insurance coverage,

stating that she made no attempts to secure coverage elsewhere because she thought she was covered under the S & A plan.

**20.** If plaintiff had enrolled for coverage near the date her employment began on October 20, 1988, her coverage would have become effective January 20, 1989. Yet Downing stated in her March 1991 affidavit that she recalled receiving an insurance booklet for plaintiff "[s]ometime *after*" the plaintiff's accident in July 1989. In a subsequent affidavit signed in June 1991, Downing stated that "[s]ometime after" the plaintiff's acci-

Danie Ard. The administrator, however, was justifiably skeptical of the account of "facts" given by Ard in his affidavit. The uncontroverted evidence reflects that S & A's claims investigators spoke with Ard on two occasions in 1989 following the plaintiff's accident, and at no time during either of those contacts did Ard mention any of the alleged facts which he later asserted in his affidavit. Logic would surely suggest that these facts, which would have gone a long way toward resolving the plaintiff's assertion that she signed up for insurance coverage, would, if true, have been reported by Ard in these earlier conversations. To view with suspicion—or as an outright fabrication—Ard's more recent recitation of these "facts" was warranted. S & A reasonably and properly considered Ard's affidavit of dubious import.[21]

## IV. CONCLUSION

The court recognizes, of course, that it is *possible* that the plaintiff did, in fact, submit an enrollment form as she claims. However, in the court's opinion, plaintiff's version of events is undermined by considerable record

evidence.[22] Defendant had no documentary evidence of plaintiff's having requested coverage at or after the time she was hired. And while plaintiff did present some evidence to support her claim, there was ample basis for questioning and/or rejecting her evidence. The court's review of the administrative record leads to the firm conclusion that S & A acted reasonably and rationally in finding that the plaintiff did not enroll for coverage. Because the court concludes that S & A was warranted in its findings and therefore did not abuse its discretion in denying plaintiff's claim for benefits, the court will accordingly grant defendant's motion for summary judgment.[23]

Based on the foregoing, it is ordered that defendant's motion for summary judgment is granted. A separate judgment will be entered in accordance with Rule 58 of the Federal Rules of Civil Procedure.

ORDERED.

---

dent, she "received notice from S & A Restaurant Corporation that there was a controversy concerning whether Ms. Goodman had enrolled as a participant in the S & A Restaurant Corporation Group Benefit Plan." Thus, according to affidavits executed by Downing nearly two years after this controversy arose, she recalled receiving an insurance booklet relatively contemporaneously with her learning that there was a controversy concerning whether Goodman had enrolled for insurance coverage. But notes taken by Sherilyn Hancock, a benefits coordinator, of a conversation with Tracey Downing on October 3, 1989 reflect that Downing had stated only that she *thought* she had seen a booklet with Goodman's name on it. Surely, Downing was in a better position to know in 1989, at a time when she was aware that there was a question about whether plaintiff had enrolled for coverage, whether she had received an insurance booklet for the plaintiff, yet the administrative record reflects that Downing's recollection at that time of receiving a booklet was at least arguably equivocal.

These observations by the court are not intended as an independent judgment of Downing's credibility in general, or the accuracy of any particular recollection on her part, but rather are merely aimed at pointing out that S & A had a more than adequate basis for cautiously viewing Downing's statements.

21. S & A also questioned Ard's veracity on the basis that he had a criminal history, having pled

guilty in March 1991 to a charge of embezzlement and four counts of misdemeanor false pretenses (bad checks).

22. The court notes that in reaching its decision on Goodman's claim, S & A was aware of but made no specific mention of the statement by Jeanne Resua concerning a conversation she claimed to have overheard between Goodman and Downing in which the two discussed the subject of insurance coverage. In the court's view, however, Resua's statement was not especially probative since she recalled only that the plaintiff, in response to Downing's asking her if she had "[gotten] on the insurance," responded, "yes." Resua did not, as plaintiff now seems to suggest, state that Downing represented to plaintiff that she had insurance coverage.

23. In addition to her claim that she is entitled to benefits because she enrolled for coverage, Goodman asserted in this action that because management personnel at the restaurant assured her that her coverage was taken care of, S & A should be estopped from denying coverage. Contrary to plaintiff's present assertion, the court has already found, implicitly if not explicitly, that her putative "estoppel" claim is not viable. *See Memorandum Opinion,* 756 F.Supp. 966 at 969, n. 3 (S.D.Miss.1990).