**REVISED**

United States Court of Appeals,

Fifth Circuit.

No. 96-30670

Summary Calendar.

SONGBYRD, INC., Plaintiff-Appellant,

v.

BEARSVILLE RECORDS, INC.; Albert B. Grossman, Estate of, erroneously sued as Bearsville Records, Inc., doing business as Bearsville Records, Defendants-Appellees.

Feb. 4, 1997.

Appeal From the U.S. District Court for the Eastern District of Louisiana.

Before HIGGINBOTHAM, DAVIS and WIENER, Circuit Judges.

WIENER, Circuit Judge:

Plaintiff-Appellant SongByrd, Inc. (SongByrd) appeals from the district court's dismissal of its action seeking to recover from Defendant-Appellee the Estate of Albert B. Grossman d/b/a Bearsville Records (Bearsville), several master tapes recorded by a legendary New Orleans musician. Concluding that (1) the district court improperly classified SongByrd's suit as a personal rather than a real action, (2) real actions are imprescriptible under Louisiana law, and (3) Bearsville has yet to establish that it gave SongByrd's predecessors-in-interest actual notice of Bearsville's intent to possess the tapes for itself, we reverse the district court's summary judgment ruling and remand for further proceedings consistent with this opinion.

I

FACTS AND PROCEEDINGS

The late Henry Roeland Byrd, also known as "Professor Longhair," was an influential New Orleans rhythm-and-blues pianist and composer, and is widely regarded as one of the primary inspirations for the renaissance of New Orleans popular music over the last thirty years. His numerous hits included original compositions such as "Tipitina" and "Go to the Mardi Gras," as well as his famous renditions of Earl King's "Big Chief." After achieving modest commercial success as a local performer and recording artist in the 1940's and 1950's, Byrd fell on hard times during the 1960's. His fortunes began to change for the better in 1970, however, when New Orleans music aficionado Arthur "Quint" Davis, along with others, founded the New Orleans Jazz and Heritage Festival ("JazzFest"). Needing talented performers for JazzFest, Davis located Byrd in 1971 working in an obscure record store in New Orleans and transformed him into a perennial star attraction of the JazzFest and other venues from that time until his death in 1980.[1]

Soon after Byrd's first performance at JazzFest, Davis, acting as the pianist's manager, and Parker Dinkins, an attorney, arranged for Byrd to make several "master recordings" at a Baton Rouge recording studio known as Deep South Recorders. These master recordings consist of four reels of 8-track tape which could be "mixed" to produce either demonstration tapes or final recordings

---

[1]These uncontroverted background facts are recounted in the liner notes to the album, Professor Longhair, *Houseparty New Orleans Style: The Lost Sessions 1971-72,* Rounder Records (1987), which SongByrd submitted as an exhibit in response to Bearsville's motion to dismiss.

suitable for the production of records, cassettes, and compact discs. According to SongByrd, several demonstration tapes produced from these master recordings found their way to Bearsville Records, Inc., a recording studio and record company located in Woodstock, New York and operated by Grossman. Impressed by the demonstration tapes, Grossman apparently arranged with Davis and Dinkins for Byrd and another New Orleans musician to travel to Bearsville's studio for a recording session.

For reasons that are unclear but not material to this appeal, the Bearsville recording sessions proved unsatisfactory. For equally unclear reasons, Davis and Dinkins wanted Grossman to be able either to listen to or play for others the full version of the Baton Rouge master recordings. In furtherance of this desire, Davis and Dinkins caused the four "master recording" tapes to be delivered to Grossman in New York. According to the as yet unrefuted affidavit of Davis, these tapes were delivered to Grossman, "as demonstration tapes only, without any intent for either Albert Grossman or Bearsville Records, Inc. to possess these aforementioned tapes as owner." Also for reasons as yet not explained by either party, the tapes remained in Grossman's possession for many years thereafter.

Acting on behalf of Davis and Byrd in 1975, Dinkins wrote two letters to Bearsville—the first addressed to a George James, the second to Grossman himself—requesting that Bearsville return the master recording tapes. Bearsville made no response whatsoever to Dinkins' letters (or at least has not introduced any evidence of a response). Dinkins, for reasons as yet unknown, did not press his

request any further.

After Albert Grossman's death in the mid 1980's, Bearsville Records, Inc. was dissolved, but Grossman's estate continued to do business as "Bearsville Records."  Even though it no longer signs artists or promotes their products, Bearsville Records still operates a recording studio which it leases to record labels and third parties;  it also licenses a catalog of recordings by artists originally under contract with Bearsville Records, Inc.  Acting in this latter capacity, Bearsville licensed certain of the Byrd master recordings to Rounder Records Corporation of Cambridge, Massachusetts (Rounder) for an advance against royalties.

In 1987, Rounder released *Professor Longhair, Houseparty New Orleans Style:  The Lost Sessions,* an album that contained 11 songs or "tracks" made from Byrd's original Baton Rouge master recordings.  This release garnered Byrd a posthumous Grammy Award for Best Traditional Blues Album of 1987.  The liner notes of the Rounder album make hardly any reference to Bearsville and no reference whatsoever to the contractual agreement between Rounder and Bearsville.[2]  Bearsville Records also licensed certain of the master recordings to another record company, Rhino Records (Rhino).  According to SongByrd's petition, Rhino released an album, titled "Mardi Gras in Baton Rouge," featuring seven tracks from the Baton Rouge master recordings.

---

[2]The only oblique reference to Bearsville is found in the third section of the liner notes authored by "The Rounder Folks" and states:  "Sadly these tapes [the Baton Rouge master recordings] were not released, but instead languished at Bearsville, their absence unremarked and unnoticed except among collectors and a few cognoscenti."

In 1993, SongByrd, Inc. was incorporated and commenced business as successor-in-interest to the intellectual property rights of Byrd and his deceased widow, Alice Walton Byrd. In 1995, SongByrd filed this lawsuit in state court in New Orleans against Bearsville Records, Inc. SongByrd's "Petition in Revindication" sought a judgment (1) recognizing its ownership of the master recordings, (2) ordering return of the recordings, and (3) awarding damages. Bearsville timely removed the suit to federal court and subsequently filed a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(2) and (6), asserting (a) lack of personal jurisdiction over Bearsville and (b) failure of SongByrd to state a cause of action because SongByrd's claims were barred by *liberative* prescription under Louisiana law. As both parties submitted affidavits and exhibits outside the pleadings, however, the district court correctly treated Bearsville's motion to dismiss as a motion for summary judgment under Fed.R.Civ.P. 56(c).[3] Pretermitting the question of personal jurisdiction, the district court then granted the motion and dismissed SongByrd's case. The court held that SongByrd's action was barred by liberative prescription and also rejected SongByrd's argument that at all times Bearsville has been

---

[3]Although defenses are generally not the proper subject of Rule 12(b)(6) motions, certain affirmative defenses that clearly appear on the face of the plaintiff's complaint - most commonly that the statute of limitations has run - may properly be asserted in a Rule 12(b)(6) motion. *See Kansa Reinsurance Co., Ltd. v. Congressional Mortgage Corp. of Texas*, 20 F.3d 1362, 1366 (5th Cir. 1994); 5A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1357, at 352 (1990). As Bearsville submitted affidavits and exhibits in support of its 12(b)(6) motion asserting the affirmative defense of liberative prescription, however, the court rectified any potential pleading deficiency by treating Bearsville's motion as one for summary judgment under Rule 56(c).

only a precarious possessor and therefore prescription has never commenced to run. SongByrd timely filed its notice of appeal from the district court's ruling.

## II

### ANALYSIS

A. *Standard of Review*

When a district court treats a Rule 12(b)(6) motion as a motion for summary judgment under Rule 56(c) because matters outside the pleadings are presented to and not excluded by the court, we review the grant of such a motion just as we would any other grant of summary judgment—that is, we review the grant of summary judgment de novo and apply the same legal standards as the district court.[4] Accordingly, summary judgement is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[5] Further, we construe all evidence in the light most favorable to the non-moving party without weighing the evidence, assessing its probative value, or resolving any factual disputes.[6]

B. *Applicable Law—*Erie*-Bound*

1. *Special Louisiana* Erie *Considerations*

---

[4]*Morin v. Caire,* 77 F.3d 116, 123 (5th Cir.1996); *Nat. Ass'n of Govern. Emp. v. City Public Serv. Bd. of San Antonio, Tex.,* 40 F.3d 698, 712 (5th Cir.1994).

[5]Fed.R.Civ.P. 56(c).

[6]*Williams v. Time Warner Operation, Inc.,* 98 F.3d 179, 181 (5th Cir.1996).

The basis of our jurisdiction, and that of the district court, to decide the instant case is diversity of citizenship, under which a federal court's obligation is to apply substantive state law. In Louisiana this obligation has special dimensions because of our unique Civilian tradition. We remain ever aware of the late Judge Rubin's caution to federal *Erie* courts applying Louisiana Civil law to steer clear of the common law principle of *stare decisis* and to apply instead the distinctly Civilian doctrine of *jurisprudence constante:*

> Because of the reviewing power of [Louisiana] appellate courts, the [Louisiana] trial judge may pay great respect to the decisions of these courts. He is not bound to do so, however, because the doctrine of *stare decisis* does not apply. Instead, each judge, trial and appellate, may consult the civil code and draw anew from its principles. Interpretation of the code and other sources of law is appropriate for each judge. The judge is guided much more by doctrine, as expounded in legal treatises by legal scholars, than by the decisions of colleagues.... Instead of *stare decisis,* the rule is one of deference to a series of decisions, *jurisprudence constante.*[7]

Emphatically elaborating on the proposition that *Erie* "does not command blind allegiance to [any] case on all fours with the case before the court,[8]" now-Chief Judge Politz wrote that:

> If anything, this flexibility is even greater when a federal court sits as a *Erie* court applying the Louisiana civil law. In such cases, "*the* Erie *obligation is to the [Civil] Code, the "solemn expression of legislative will.*' " *Shelp,* 333 F.2d 439 (quoting the very first article of the Louisiana Civil Code). The Louisiana Supreme Court has taken great pains to "plainly state that ... *the notion of stare decisis, derived as it is from the common law should not be thought*

---

[7]Alvin B. Rubin, *Hazards of a Civilian Venturer in a Federal Court: Travel and Travail on the* Erie *Railroad,* 48 La.L.Rev. 1369, 1372 (1988) (citations omitted) (emphasis in original).

[8]*Shelp v. National Surety Corp.,* 333 F.2d 431, 439 (5th Cir.), *cert. denied,* 379 U.S. 945, 85 S.Ct. 439, 13 L.Ed.2d 543 (1964).

*controlling in this state." Ardoin v. Hartford Acc. & Indem. Co.,* 360 So.2d 1331, 1334 (La.1978). While caselaw in the State of Louisiana is acknowledged as "invaluable as previous interpretation ..." [*id.* at 1335], it is nonetheless properly regarded as "secondary information." *Id.* at 1334.[9]

## 2. *Prescription*

The central issue in the instant appeal is whether plaintiff's action is time barred. The answer to this question depends on whether the applicable period of limitation—prescription in Louisiana; statute of limitations in the common law—is liberative or acquisitive. As shall be seen from our analysis of the pertinent provisions of the Louisiana Civil Code and from "legal treatises by legal scholars," the applicable type of prescription is acquisitive. And, as shall also be seen below, our analysis of Louisiana case law reveals that (1) this determination comports with implications of the most recent pronouncement of the Supreme Court of Louisiana, and (2) at the very least, the "jurisprudence" on point is *not* "constante," which frees us to pursue our own analysis of the Code, with the help of doctrinal writing.

## C. *Revendicatory Actions Are Imprescriptible*

SongByrd contends that the district court erred when it determined that SongByrd's action seeking recognition of its ownership interest in the master recordings, return of those

---

[9]*Green v. Walker,* 910 F.2d 291, 294 (5th Cir.1990) (footnotes omitted) (emphasis added). *See also Principal Health Care of Louisiana, Inc. v. Lewer Agency, Inc.,* 38 F.3d 240, 245 n. 6 (5th Cir.1994) ("Louisiana, being the only civil law jurisdiction among the fifty states, is unique in that its approach to solving most legal questions begins first and foremost with a review of the Louisiana Civil Code. The Civil Code is thus the civilian's "Bible.' Jurists in common law jurisdictions, on the other hand, usually begin with a review of the case law on a particular issue.").

recordings, and damages, has prescribed under Louisiana law.  The district court's memorandum order held that SongByrd's action had prescribed under Louisiana Civil Code Articles 3499 and 3492 regardless of whether SongByrd's claims were based in contract, quasi-contract, or tort.  In so doing, the district court implicitly characterized SongByrd's action as a "personal action" arising from these areas of law.  This characterization of SongByrd's action constitutes the first and fundamental error committed by the district court and led to its first erroneous holding.

As explained by Professor A.N. Yiannopoulos in his treatise on Louisiana property law, actions seeking recognition of ownership or enforcement of the rights thereof, whether in movable or immovable property, are not *personal* actions;  they are "*real* actions."[10]  Such real actions, otherwise known as "revendicatory actions," are expressly authorized by the Louisiana Civil Code.[11] As the official comments to the Code make clear, there are two kinds of revendicatory action, depending on the object of the ownership interest that the plaintiff seeks to have recognized: (1) a "*petitory action* " for the recovery of immovable property (real estate), and (2) an "*innominate real action* " for the recovery of movable property (personalty).[12]   Further, any

---

[10]A.N. Yiannopoulos, 2 *Louisiana Civil Law Treatise* § 241, 476 (1991).

[11]*See* La.Civ.Code art. 526.

[12]La.Civ.Code art. 526, cmt. b.;  *see also* Yiannopoulos, *supra,* §§ 347 & 350, at 675-77 & 680-81 (on availability of real or revendicatory actions for the recovery of movable property under Louisiana law).

"incidental demand for damages made in an action for the recovery of an immovable [or a movable] does not affect the classification of the main demand as a real action."[13]

It follows from this basic dichotomy that, as the Civil Code specifically provides liberative prescription periods for all manner of *personal* actions (including delictual, contractual and quasi-contractual actions),[14] "[l]iberative prescription does not bar *real* actions seeking to protect the right of ownership."[15] The rationale for this distinction is that "[u]nder our Civil Code, ownership can never be lost by the failure to exercise it—only by the acquisition of ownership by another through possession sufficient to acquire it through an acquisitive prescription."[16] Thus, it is well established in Louisiana that the petitory action (for the protection of immovables) is *not* barred by liberative prescription.[17] The same rule applies to the revendicatory action brought to assert or protect the right of ownership in movable property because it, too, is a *real* action, not a personal one. On this point Professor Yiannopoulos' *Louisiana Civil Law Treatise* could not be clearer:

> An action that is grounded on a wrongful act, that is, an offense or quasi-offense, is subject to the prescription of

---

[13]Yiannopoulos, *supra,* § 242, at 477.

[14]*See* La.Civ.Code arts. 3492–3502.

[15]Yiannopoulos, *supra,* § 249, at 487.

[16]*All-State Credit Plan Natchitoches, Inc., v. Ratliff,* 279 So.2d 660, 666 (La.1972).

[17]Yiannopoulos, *supra,* § 249, at 487; *see also Northcott Exploration Co. v. W.R. Grace & Co.,* 430 So.2d 1077, 1080 (La.Ct.App. 3rd Cir.1983).

one year and an action grounded on quasi-contract is subject to the prescription of ten years. *The revendicatory action [for the recovery of movable property] is imprescriptible;* however, such an object is without object when the defendant has acquired the ownership of a movable by the acquisitive prescription of three or ten years.[18]

Despite this obvious truism of Civilian doctrine,[19] a number of older Louisiana decisions overlooked or disregarded it and, just as the district court did here, applied either one-year or ten-year periods of *liberative* prescription on the erroneous assumption that the revendicatory action is personal in nature, either delictual[20] or quasi-contractual.[21]

Nevertheless, a 50-year old Louisiana Supreme Court case,

---

[18]Yiannopoulos, *supra,* § 358, at 692-93 (emphasis added).

[19]*See id.* § 358, at 693, n. 5-8 (cases cited therein). Neither the briefs filed by the parties nor our independent research reflect even relatively recent treatment of this issue by the Louisiana Supreme Court, and the older case law is, at best, mixed. Cases from the 1920's and 1930's occasionally characterize as delictual (tort), actions involving alleged illegally or fraudulently appropriated movable property, and opinions from the 1930's and early 1940's classified as quasi-contractual or personal, actions seeking recovery of wrongfully taken movables or proceeds of involuntary alienation of movables.

[20]*See, e.g., McGuire v. Monroe Scrap Material Co.,* 189 La. 573, 180 So. 413 (1938) (characterizing as delictual an action for value of movable property alleged to have been illegally and fraudulently appropriated); *Carter-Allen Jewelry Co. v. Overstreet,* 165 La. 887, 116 So. 222 (1928) (characterizing as delictual an action by jeweler alleging that salesman stole customer's ring or permitted someone else to steal it through his negligence).

[21]*See, e.g., Kramer v. Freeman,* 198 La. 244, 3 So.2d 609 (1941) (plaintiff seeking recovery of wrongfully taken movables had cause of action in tort and quasi-contract, with pleadings indicating a waiver of tort action); *Smith v. Phillips,* 175 La. 198, 143 So. 47 (1932) (action by former homeowner to recover portion of proceeds of Sheriff's sale as homestead exemption characterized as personal action subject to ten-year liberative prescription under civil Code article 3544 (1870)).

*Faison v. Patout,*[22] appears to be the most recent pronouncement on point, and it supports our reading of the Civil Code and Professor Yiannopoulos' reading as well. In *Faison,* Mrs. Hypolite Patout executed a manual donation of her jewelry to her two daughters. Following the donor's death, one of her sons, Sebastian Patout, suggested to his sisters that it was unsafe for them to keep this jewelry in one sister's bedroom; so, with his sisters' permission, Sebastian put the jewelry in *his* bank safety deposit box. Sebastian died some twelve years later, whereupon his widow removed the jewelry from the safety deposit box and refused to give it to the sisters. In the sisters' suit to recover the jewelry, the trial court held, and the Louisiana Supreme Court agreed, that the sisters were the true owners. More significant to our consideration today, the *Patout* defendants (children of Mrs. Hypolite Patout's sons) had pled liberative prescription under Louisiana Civil Code article 3544 (1870). They contended that their aunts' action was personal and thus had prescribed because more than ten years had elapsed between the time the property left the aunts' possession and the time suit was filed. Rejecting this contention, the Supreme Court wrote:

> There might be some merit in a plea of prescription if Sebastian Patout had possessed the property *for himself and the other heirs,* and *adversely to [his sisters],* but the record convinces us that he was acting as depository for his two sisters, these plaintiffs, and that his possession of the property was for their benefit—for them, and *not in his own name or right.*
>
> Counsel for defendants is in error in his contention that the ten-year [liberative] prescription under article 3544 commenced to run in March 1931 [when Sebastian took possession

---

[22]212 La. 37, 31 So.2d 416 (1947).

of the jewelry].  [Acquisitive] [p]rescription began to run when plaintiffs were first denied delivery of this jewelry in June 1942, after the death of their brother, Sebastian Patout, and this suit was filed in December 1942, about six months later.[23]

In thus rejecting the defendants' plea of *liberative* prescription, the Louisiana Supreme Court clearly recognized that the concepts of *precarious* possession and *acquisitive* prescription applied to this action for the recovery of movable property, even though the court did not use these terms of art.  The facts in *Faison* are closely analogous to the situation before us today, and the holding of the Louisiana Supreme Court in *Faison*—the most recent pronouncement by the highest court of the state—is instructive despite being non-binding due to the inapplicability of the common law doctrine of *stare decisis.*[24]

In sum, even though some decisions of the Louisiana Supreme Court have treated actions for recovery of movables as personal (delictual and occasionally as quasi-contractual), other decisions of that court have found that such actions are properly considered to assert claims of ownership and therefore are subject only to *acquisitive* prescription.  Despite its age, *Patout* is still the most recent Louisiana Supreme Court pronouncement on point, and it so held.  But regardless whether the most recent pronouncement of the Louisiana Supreme Court supports our analysis of the Civil Code

---

[23]*Id.* at 418-19 (emphasis added).

[24]*See also Jeanfreau v. Jeanfreau,* 182 La. 332, 162 So. 3 (1935) (owner of motorboat made simulated title transfer to his brother "for convenience sake only," never intending to relinquish actual ownership.  In true owner's suit to recover the boat, defendant's plea of *acquisitive* prescription of three years under Louisiana Civil Code articles 496, 3506, and 3476 (1870) recognized implicitly by Louisiana Supreme Court as proper).

and that of Professor Yiannopoulos, there is simply no *jurisprudence constante* on the question. It follows, then, that our *Erie*-bound decision to follow the plain wording and indisputable structure of the Louisiana Civil Code and Professor Yiannopoulos' analysis is either supported by or at least does no violence to Louisiana's jurisprudence as a secondary source of law. To the extent that our decision today may constitute an "*Erie* guess," we take additional comfort in the observation that almost 60 years have passed since the Louisiana Supreme Court last applied liberative prescription to actions claiming ownership or possession of movable property—a span of years attributable at least in part, we assume, to the broad reliance in recent decades on Professor Yiannopoulos' doctrinal work on this subject.

As SongByrd's "Petition in Revindication" sought recognition of its purported ownership interest in the Baton Rouge master recordings and recovery of possession of those recordings, and only incidentally sought damages resulting from Bearsville's contravention of SongByrd's alleged ownership interest, we hold that, as a fundamental matter of Louisiana property law, SongByrd's action is not subject to liberative prescription.

D. *Termination of Precarious Possession and Actual Notice*

This foundational holding does not end our analysis in the instant case, however. In addition to its failure to characterize SongByrd's suit as a real action and its concomitant error in applying the rules of liberative prescription, the district court also missed the mark in its treatment of SongByrd's assertion that Bearsville was and is only a precarious possessor. To situate the

concept of precarious possession in its proper Civilian context, we again return to basics. As Professor Yiannopoulos explains, a defendant in possession (such as Bearsville) may defend a revendicatory action for the recovery of movable property by (1) asserting some right, be it personal or real, to possess the movable, or (2) claiming that he is in fact the owner of the movable by virtue of, e.g., a transfer from the owner, *acquisitive* prescription, or some other mode of acquiring ownership.[25] No such defenses have been proffered by Bearsville; but if, on remand, it should assert the defense of acquisitive prescription, the district court will have to address SongByrd's contention—made both in its original petition and in opposition to Bearsville's motion to dismiss—that Bearsville is and always has been nothing more than a precarious possessor.

Under the Civil Code, the concept of "precarious possession" is defined within Title XXIII of Book III, "Of the Different Modes of Acquiring the Ownership of Things," as "the exercise of possession over a thing with the permission of or on behalf of the owner or possessor."[26] A precarious possessor is presumed to possess for another,[27] but precarious possession may be terminated or converted to possession on one's own behalf in either of two

---

[25]*Id.* § 354, at 687.

[26]La.Civ.Code art. 3437.

[27]La.Civ.Code art. 3438. Conversely, "[o]ne is presumed to intend to possess as owner *unless* he began to possess in the name of and for another." La.Civ.Code art. 3427 (emphasis added). This presumption set forth in article 3427 in favor of a person who exercises factual authority does not arise, however, when "there is proof that the possession was precarious at its inception." Yiannopoulos, *supra,* § 370, at 617.

specific ways. First, a precarious possessor who is a co-owner (or his universal successor) may terminate his precarious possession, and thus begin to possess for himself alone, only when he demonstrates his intent to possess for himself by "overt and unambiguous acts sufficient to give notice to his co-owner."[28] Second, a precarious possessor who is *not* a co-owner is held to a higher standard and only "commences to possess for himself when he gives *actual notice* of this intent to the person on whose behalf he is possessing."[29]

In the instant case, then, should Bearsville assert that it acquired ownership of the master recordings by acquisitive prescription of either three or ten years, pursuant to Louisiana Civil Code Articles 3489-91, it will have to overcome SongByrd's assertion, so far supported by Quint Davis' affidavit, that Davis and Dinkins delivered the master recordings to Bearsville intending only for Bearsville to possess the tapes precariously. Bearsville may, of course, assert that (1) it was never a precarious possessor, or (2) even if it was a precarious possessor initially, at some point it terminated its precarious possession and began to

_____

[28]La.Civ.Code art. 3439.

[29]*Id.* (emphasis added). Another respected Louisiana commentator has observed (1) that the "actual notice" required to convert precarious possession to adverse possession constitutes a more stringent standard than was needed prior to the 1983 revision of Title XXIII of Book III of the Louisiana Civil Code dealing with occupancy, possession and acquisitive prescription, Symeon Symeonides, *Property,* 46 La.L.Rev. 655, 680 (1986), and (2) that the "overt and unambiguous acts sufficient to give notice" standard imposed on co-owners is "a less exacting burden of proof" than the "actual notice" standard imposed on other precarious possessors. Symeon Symeonides, *One Hundred Footnotes to the New Law of Possession and Acquisitive Prescription,* 44 La.L.Rev. 69, 86 (1983).

possess for itself.  Either way, Bearsville will have the burden of proving facts sufficient to support such a defense.

It is the non-co-owner context in which we finally address the district court's alternative—and, strictly speaking, premature—holding that Bearsville's failure to respond to Dinkins' letters requesting return of the tapes in 1975 and its later licensing agreements with Rounder and Rhino, constituted "actual notice" sufficient to convert Bearsville's precarious possession as a matter of law.  This ruling, we observe, is clearly inconsistent with Louisiana law.

We have not been able to locate (and Bearsville has not cited to us) a single Louisiana case that supports the novel proposition that alone either (1) a minimal, apparently clandestine action—such as entering into a contractual agreement with a third party to enjoy the fruits of a movable without directly informing the owner of the movable of that agreement—or (2) mere inaction in the face of a request for a return of the movable to its owner, can somehow constitute "actual notice" for purposes of terminating precarious possession of the movable of a non-co-owner.[30]  To the contrary, recent Louisiana cases concerning termination of precarious possession reflect that the notice burden imposed on precarious

_____

[30]The two cases cited by Bearsville which held that mere silence or passivity is insufficient to bring the doctrine of *contra non valentum* into play are clearly inapposite as that doctrine concerns the interruption of *liberative* prescription of personal actions not *acquisitive* prescription in the context of real actions. *See Cyr v. Louisiana Intrastate Gas Corp.,* 273 So.2d 694, 697-98 (La.Ct.App. 1st Cir.1973); *Colley v. Canal Bank & Trust Co.,* 159 F.2d 153, 154 (5th Cir.1947).

possessors in such instances is much more stringent.[31]  As one court

put it,

> a possessor whose possession begins other than as an owner
> must do something to make generally known that he has changed
> his intent and he must prove specifically when he manifested
> to others his intent to possess as owner.  Continued physical
> possession alone does not suffice to rebut the presumption
> that the possession remains precarious.  The character and
> notoriety of the possession must be sufficient to inform the
> public and the record owners of the possession as owner.[32]

We therefore conclude that actual notice sufficient to convert or

terminate precarious possession cannot be based solely on either

minimal and apparently clandestine actions such as those described

above or on merely standing mute in the face of a direct inquiry or

request for return of the property.

This is not to say, of course, that the defendant may not

refer to these facts in a subsequent motion for summary judgment or

a full evidentiary hearing should Bearsville eventually assert that

at some point it began to possess the master recordings for itself

---

[31]*See e.g., Robin v. Finley,* 597 So.2d 178, 180 (La.Ct.App. 3rd Cir.1992) ("actual notice" sufficient to begin acquisitive prescription not given until precarious possessors filed a possessory action);  *Satsuma Pentecostal Church v. Harris,* 563 So.2d 1247, 1249 (La.Ct.App. 1st Cir.1990) (church that was a precarious possessor did not begin to possess for itself for purposes of instituting a possessory action under La.Code Civ. Proc. art. 3658(2) until church's representative voiced objection to owner's proposed sale of property and clearly notified owner that church claimed ownership);  *Morris v. Sonnier,* 546 So.2d 1296, 1300 (La.Ct.App. 1st Cir.1989) (acts of corporeal possession are insufficient to constitute "actual notice" for precarious possessors who began possession as lessees);  *Feazel v. Howard,* 511 So.2d 1306, 1308-09 (Ct.App. 2nd Cir.), *writ denied,* 514 So.2d 456 (La.1987) (precarious possessor did not give "actual notice" to owner that he intended to possess for himself as he admitted at trial that he never made an assertion of ownership of disputed tract).

[32]*Hammond v. Averett,* 415 So.2d 226, 227 (La.Ct.App. 2nd Cir.1982) (citations omitted).

and gave SongByrd's predecessors-in-interest actual notice of such an intention. Doubtless these facts and others will have to be considered by the trier of fact in resolving such an acquisitive prescription defense in general and the actual notice issue in particular. We simply hold today that the limited evidence presented to the district court on Bearsville's motion to dismiss-cum-summary judgment, on the ground of *liberative* prescription, was insufficient to determine that Bearsville satisfied the high burden of proof necessary to establish that it gave SongByrd's predecessors-in-interest *actual* notice of its intent thenceforth to possess for itself, converting its precarious possession to adverse possession for the purpose of *acquisitive* prescription.

## III

## CONCLUSION

For the reasons stated above, we reverse the district court's grant of summary judgment in favor of Bearsville and remand the case for further proceedings consistent with this opinion. On remand, the district court is free to address the personal jurisdiction question that it pretermitted in its summary judgment ruling, an issue which is not before us on this appeal and on which we express no opinion at this juncture.

REVERSED and REMANDED.