Charles B. WISE, Plaintiff,

v.

LUCENT TECHNOLOGIES INC. PENSION PLAN and Lucent Technologies Inc., as successor of Western Electric Co., Defendants.

No. CIV.A. H–99–134.

United States District Court,
S.D. Texas.

June 22, 2000.

Gerald Kendrick Payte, Houston, TX, for Charles B Wise, plaintiff.

John L Collins, Seyfarth Shaw et al, Houston, TX, for Kathleen M Decou, Lucent Technologies Incorporated, successor of Western Electric Co., Lucent Technologies, Inc., Pension Plan, defendants.

## MEMORANDUM AND ORDER

CRONE, United States Magistrate Judge.

Pending before the court is Defendants Lucent Technologies Inc. Pension Plan ("the Lucent Plan") and Lucent Technologies Inc.'s ("Lucent") Motion for Summary Judgment (# 20). Having reviewed the motion, the submissions of the parties, the pleadings, and the applicable law, the court is of the opinion that Defendants' motion should be granted.

## I. *Background*

Wise is a resident of Kingwood, Texas, and is a former employee of Western Electric Company ("Western"), in Shreveport, Louisiana. Lucent is the successor-in-interest to various assets and obligations of Western. Before January 1, 1984, Western was a wholly-owned subsidiary of American Telephone & Telegraph Company ("AT & T"). From 1984 to 1996, the former manufacturing operations of Western operated as divisions or subsidiaries of AT & T. Lucent operated these businesses as subsidiaries of AT & T from February 1996 through September 1996. On October 1, 1996, Lucent became independent of AT & T.

The Lucent Plan is the successor to the Western Electric Plan for Employees' Pensions, Disability Benefits and Death Benefits ("the Western Plan") in effect on February 13, 1970. The Lucent Plan contains a claims review procedure, which benefit claimants are obligated to exhaust before seeking judicial relief. Claimants must first present their claims to the plan administrator and may then appeal the administrator's decision to the Employees' Benefit Committee ("EBC"). The Lucent Plan provides that the EBC has full discretion to consider and decide such claims and that its determinations are final and binding. Specifically, Article 3.4 of the Lucent Plan states:

**3.4 Conclusive Determination by the Committee**

The Committee shall be the final review committee under the Plan, with the authority to determine conclusively for all parties any and all questions arising from the administration of the Plan, and shall have sole and complete discretionary authority and control to manage the operation and administration of the Plan, including, but not limited to, the

736

determination of all questions relating to eligibility for participation and benefits, interpretation of all Plan provisions, determination of the amount and kind of benefits payable to any participant, spouse or beneficiary, and construction of disputed or doubtful terms. Such decisions shall be conclusive and binding on all parties and not subject to further review.

Similarly, paragraphs 3 and 4 of Section 3 of the Western Plan in effect in 1970 provided that the EBC "shall determine conclusively for all parties all questions arising in the administration of the Plan" and "shall be empowered to authorize disbursements according to [the Plan's] regulations." In addition, Paragraph 3 of Section 8 of the plan provided that "[i]n all questions relating to the term of employment and rates of pay of employees, the decision of the Committee, based upon the Regulations and upon the records of the Company, shall be final."

Wise began working in an hourly manufacturing position at Western's Shreveport plant on February 21, 1949. On July 22, 1966, after seventeen years and five months of employment, he resigned from his position with Western. The pension plan in effect at the time of Wise's resignation was the 1964 Western Electric Plan For Employees' Pensions, Disability Benefits And Death Benefits ("the 1964 Plan"). The 1964 Plan provided a pension benefit only to employees who reached retirement age and met other qualifications while still employed by Western. There was no provision in the 1964 Plan for payment of a deferred vested benefit.

On November 16, 1966, Western's Board of Directors passed a resolution authorizing the EBC to permit credit for prior service if the employee worked continuously for a five-year period following reemployment. Effective June 1, 1969, the Western Plan was amended to provide a deferred service benefit payable at age 65 for employees who attained age 40 and had 15 years of service and whose employment

terminated on or after June 1, 1969 ("the 1969 Plan"). The 1969 Plan specifically provided, however, that without contrary authorization from the Board of Directors, an employee's absence would generally be considered a break in service and, therefore, would not be added to any period of later employment. The 1966 Board resolution authorized an exception to the break-in-service provision for employees who had five years of continuous service after a period of absence.

Wise was rehired by Western on August 8, 1969. He worked for only six months and five days before he resigned again on February 13, 1970. For the next twenty-five years, Wise had no contact with Western or any of its successor entities.

Wise attained age 65 on April 1, 1991, and sought a pension from Lucent four or five years later, sometime in 1996 or 1997. Wise applied for benefits under the Lucent Plan, claiming entitlement to a deferred service pension under the 1969 Plan due to his seventeen years of service with Western between 1949 and 1966 and his subsequent reemployment for six months in 1969 and 1970.

On January 14, 1998, Kathleen M. De-Cou ("DeCou"), Lucent's Pension Plan Administrator, denied Wise's claim. DeCou's letter to Wise explains, in part:

As Lucent Technologies Pension Plan Administrator, I have the responsibility to adjudicate claims arising under the Lucent Technologies Inc. Pension Plan (LTPP). After a full review of all available information (including the material submitted with your claim, if any) and the terms of the LTPP, I have determined that I must deny your claim for eligibility for a deferred service pension.

\* \* \* \* \* \*

When you resigned from the Company on July 22, 1996 you did not meet the age and service requirements under the pension plan covering Western Electric employees for an immediately payable service pension. There was no provi-

sion in the pension plan at that time for payment of a vested pension. The only pension available at that time was a service pension for those employees terminating with the requisite age and service combination. Provision for a "deferred service pension" was first introduced into the pension plan effective June 1, 1969, which was a date subsequent to your resignation from Western Electric's active payroll on July 22, 1966. As stated above, the deferred service pension provision of the pension plan only applied to those employees on the active payroll on or after June 1, 1969, who were at least age 40 with a minimum of 15 years term of employment (commonly referred to as Net Credited Service).

Company records indicate that you were rehired on August 8, 1969 and resigned again on February 13, 1970. On February 13, 1970 you had only six months, five days of term of employment as defined by the Pension Plan, so although you were then over age 40, you did not meet the Plan's minimum 15 years of term of employment requirement. It is important to note that Company policy with respect to service bridging required that you would have had to work five consecutive years following your reemployment on August 8, 1969 in order for your prior 17 years of service to be bridged. Since you returned to work for less than five years, you did not meet the service bridging eligibility requirements prior to your resignation on February 13, 1970.

Accordingly, per the terms of the then current Plan, on February 13, 1970 your term of employment was six months, 5 days. Since you did not meet the requirement of at least 15 years of term of employment when you left the active payroll on February 13, 1970, in accordance with the provisions of the Plan, you are not eligible for a deferred service pension.

Because the LTPP is a qualified pension plan under the Internal Revenue Code, the Company is required by federal law to administer the Plan in strict accordance with its terms and provisions. Therefore, the Company simply cannot make exceptions to the provisions of the Plan for you or other individuals in similar situations.

At deposition on January 12, 2000, Wise claimed that, sometime after he left Western in 1966 and while he was working elsewhere, he had a meeting at Western's Sheveport plant with Jack Banks ("Banks"), a production superintendent, and Stan Schneider ("Schneider"), an assistant superintendent. According to Wise, the parties discussed the possibility of his returning to work at the plant. Wise further testified that he informed Banks and Schneider that he wanted his past service bridged so that he would be eligible for a deferred vested pension. The parties allegedly discussed the possibility of bridging Wise's past service if he worked at the plant for another six months. At deposition, Wise stated that he told Banks and Schneider, "When you send off to the benefit service committee and get it approved and everything like that, I'll come back."

According to Wise, in 1970, during a subsequent conversation with Banks and Schneider, they showed him a piece of paper and said, "Here it is. It's all been signed. You've been approved, and your service will be bridged." Although Wise testified at deposition that the paper had the words Western Electric "written all over it" and was signed by the secretary of the benefits service committee, he could not remember any of the specific language of the purported document. Wise further admitted that he never had a copy of the alleged document in his possession.

In her April 28, 2000, affidavit, DeCou stated that when she was evaluating Wise's claim for benefits, she searched Wise's employment records. DeCou indicated that she could not find any record

reflecting that Western's Benefits Committee, Board of Directors, or other representative of Western had ever determined that Wise would be credited for his past service with Western if he worked for an additional six months.

DeCou's letter of January 14, 1998, informed Wise of his right to appeal to the Lucent EBC and to submit supporting documentation. In a letter dated February 9, 1998, Wise appealed DeCou's denial of his claim to the EBC. Wise's letter complains of the alleged failure of Lucent to retrieve employment documents from the 1960s, including a document purportedly showing service bridging in contravention of the terms of the 1966 Board resolution. The EBC acknowledged Wise's appeal on February 25, 1998, notifying him that his claim would be considered at the EBC's March 13, 1998, meeting.

By letter dated March 19, 1998, Michael J. Harrison, Secretary of the EBC, advised Wise that, after fully reviewing the facts, including the information he provided, the EBC had denied his appeal with respect to his eligibility for a deferred service pension. The explanation given for this decision was that Wise's pre–1966 service was not vested under the terms of the 1964 Plan and he had resigned only six months after being reemployed in 1970, rather than working an additional five years, as required by the 1969 Plan.

On January 14, 1999, Wise filed the instant lawsuit seeking the recovery of pension benefits. Wise initially alleged claims under ERISA and under state law for breach of contract. On February 11, 2000, the court granted Wise's motion to amend his complaint to substitute the Lucent Plan as a defendant instead of Kathleen DeCou and to add a common law fraud claim under state law. Wise, therefore, now seeks pension benefits under ERISA as well as damages for breach of contract and fraud. Defendants filed the instant motion for summary judgment on May 1, 2000.

## II. *Analysis*

### A. *Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The parties seeking summary judgment bear the initial burden of informing the court of the basis for their motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which they believe demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Colson v. Grohman,* 174 F.3d 498, 506 (5th Cir.1999); *Marshall v. East Carroll Parish Hosp. Serv. Dist.,* 134 F.3d 319, 321 (5th Cir. 1998); *Wenner v. Texas Lottery Comm'n,* 123 F.3d 321, 324 (5th Cir.1997), *cert. denied,* 523 U.S. 1073, 118 S.Ct. 1514, 140 L.Ed.2d 667 (1998). The moving parties, however, need not negate the elements of the nonmovant's case. *See Wallace v. Texas Tech Univ.,* 80 F.3d 1042, 1047 (5th Cir.1996) (citing *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994)).

Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings, but must present affirmative evidence, setting forth specific facts, to show the existence of a genuine issue for trial. *See Celotex Corp.,* 477 U.S. at 322–23; 106 S.Ct. 2548; *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Colson,* 174 F.3d at 506; *Marshall,* 134 F.3d at 321–22; *Wallace,* 80 F.3d at 1047;

*Little,* 37 F.3d at 1075. All the evidence must be construed "in the light most favorable to the non-moving party without weighing the evidence, assessing its probative value, or resolving any factual disputes." *Williams v. Time Warner Operation, Inc.,* 98 F.3d 179, 181 (5th Cir.1996) (citing *Lindsey v. Prive Corp.,* 987 F.2d 324, 327 n. 14 (5th Cir.1993)); *see Colson,* 174 F.3d at 506; *Marshall,* 134 F.3d at 321; *Messer v. Meno,* 130 F.3d 130, 134 (5th Cir.1997), *cert. denied,* 525 U.S. 1067, 119 S.Ct. 794, 142 L.Ed.2d 657 (1999); *Hart v. O'Brien,* 127 F.3d 424, 435 (5th Cir.1997), *cert. denied,* 525 U.S. 1103, 119 S.Ct. 868, 142 L.Ed.2d 770 (1999); *Songbyrd, Inc. v. Bearsville Records, Inc.,* 104 F.3d 773, 776 (5th Cir.1997). " 'The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.' " *Reves v. Ernst & Young,* 507 U.S. 170, 190 n. 3, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993) (quoting *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505); *Palmer v. BRG of Ga., Inc.,* 498 U.S. 46, 49 n. 5, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990); *see Marshall,* 134 F.3d at 321. Nonetheless, " 'only *reasonable* inferences can be drawn from the evidence in favor of the nonmoving party.' " *Eastman Kodak Co. v. Image Tech. Servs.,* 504 U.S. 451, 469 n. 14, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (emphasis in original). "If the [nonmoving party's] theory is ... senseless, no reasonable jury could find in its favor, and summary judgment should be granted." *Id.* at 468–69, 112 S.Ct. 2072.

The nonmovant's burden is not satisfied by "some metaphysical doubt as to material facts," conclusory allegations, unsubstantiated assertions, speculation, the mere existence of some alleged factual dispute, or "only a scintilla of evidence." *Little,* 37 F.3d at 1075; *see Hart,* 127 F.3d at 435; *Wallace,* 80 F.3d at 1047; *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1429 (5th Cir.1996) (citing *Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.), *cert. denied,* 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994)); *State Farm Life Ins. Co. v. Gutterman,* 896 F.2d 116, 118 (5th Cir.

1990) (citing *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505). Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to his case on which he bears the burden of proof at trial. *See Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993); *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548; *Wenner,* 123 F.3d at 324. "In such a situation, there can be 'no genuine issue as to any material fact' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548.

### B. *ERISA Claim*

Initially, Defendants argue that Wise's claim for pension benefits fails as a matter of law because DeCou and the EBC properly denied Wise's claim pursuant to the 1969 Plan.

▮ Under ERISA, when a retirement plan gives its administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan, a reviewing court must evaluate the plan administrator's decision under an abuse of discretion standard. *See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Duhon v. Texaco, Inc.,* 15 F.3d 1302, 1305 (5th Cir.1994); *Haubold v. Intermedics, Inc.,* 11 F.3d 1333, 1336–37 (5th Cir.1994); *Perdue v. Burger King Corp.,* 7 F.3d 1251, 1254 (5th Cir.1993); *Wildbur v. ARCO Chem. Co.,* 974 F.2d 631, 636 (5th Cir. 1992). Because the Lucent Plan expressly gives the EBC discretionary authority to determine all questions of eligibility and status, the "abuse of discretion" standard applies. *See Firestone Tire & Rubber Co.,* 489 U.S. at 115, 109 S.Ct. 948.

▮ In applying the abuse of discretion standard, the court analyzes whether the plan fiduciary acted arbitrarily or capriciously. *See Meditrust Fin. Servs. Corp.*

*v. Sterling Chems., Inc.,* 168 F.3d 211, 215 (5th Cir.1999); *Bellaire Gen. Hosp. v. Blue Cross & Blue Shield,* 97 F.3d 822, 829 (5th Cir.1996); *Sweatman v. Commercial Union Ins. Co.,* 39 F.3d 594, 601 (5th Cir. 1994). "A decision is arbitrary only if 'made without a rational connection between the known facts and the decision or between the found facts and the evidence.'" *Meditrust Fin. Servs. Corp.,* 168 F.3d at 215 (quoting *Bellaire Gen. Hosp.,* 97 F.3d at 828–29); *see Dowden v. Blue Cross & Blue Shield of Tex., Inc.,* 126 F.3d 641, 644 (5th Cir.1997). "When reviewing for arbitrary and capricious actions resulting in an abuse of discretion," a district court must "affirm an administrator's decision if it is supported by substantial evidence." *Id.* "Assuming that both parties were given an opportunity to present facts to the administrator, our review of factual determinations is confined to the record available to the administrator." *Meditrust Fin. Servs. Corp.,* 168 F.3d at 215 (citing *Wildbur,* 974 F.2d at 639).

 Before a reviewing court can determine whether an administrator's denial of benefits was an abuse of discretion, "[it] must determine the [legally] correct interpretation of the Plan's provisions." *Haubold,* 11 F.3d at 1337; *see Whittaker v. BellSouth Telecommunications, Inc.,* 206 F.3d 532, 535 (5th Cir.2000); *Wildbur,* 974 F.2d at 637; *Batchelor v. International Bhd. of Elec. of Workers Local 861 Pension & Retirement Fund,* 877 F.2d 441, 444 (5th Cir.1989); *Goodman v. S & A Restaurant Corp.,* 821 F.Supp. 1139, 1144 (S.D.Miss.1993). If the administrator has not given the plan the legally correct interpretation, the court must then determine whether the administrator's interpretation constitutes an abuse of discretion. *See Whittaker,* 206 F.3d at 535; *Haubold,* 11 F.3d at 1337; *Wildbur,* 974 F.2d at 637; *Batchelor,* 877 F.2d at 444. In answering the first question, a court must consider: (1) whether the administrator's interpretation is consistent with a fair reading of the plan; (2) whether the administrator has

given the plan a uniform construction; and (3) whether the interpretation results in any unanticipated costs to the plan. *See Chevron Chem. Co. v. Oil, Chem. & Atomic Workers Local Union,* 47 F.3d 139, 145 (5th Cir.1995); *see also Whittaker,* 206 F.3d at 535; *Rhorer v. Raytheon Eng'rs & Constructors, Inc.,* 181 F.3d 634, 640 n. 7 (5th Cir.1999); *Haubold,* 11 F.3d at 1337; *Wildbur,* 974 F.2d at 638; *Jordan v. Cameron Iron Works, Inc.,* 900 F.2d 53, 56 (5th Cir.), *cert. denied,* 498 U.S. 939, 111 S.Ct. 344, 112 L.Ed.2d 308 (1990); *Goodman,* 821 F.Supp. at 1144 n. 7. "If the administrator has applied a legally correct interpretation of the Plan, then no further inquiry is required." *Kolodzaike v. Occidental Chem. Corp.,* 88 F.Supp.2d 745, 747 (S.D.Tex.2000); *see Tolson v. Avondale Indus., Inc.,* 141 F.3d 604, 608 (5th Cir. 1998); *Shelton v. Benefit Plan of Exxon Corp.,* 8 F.Supp.2d 616, 620 (S.D.Tex. 1998), *aff'd,* 182 F.3d 915 (5th Cir.1999) (citing *Chevron Chem. Co.,* 47 F.3d at 146; *Haubold,* 11 F.3d at 1341); *Alcorn v. Sterling Chems. Inc. Med. Benefits Plan for Hourly–Paid Employees,* 991 F.Supp. 609, 615 (S.D.Tex.1998), *aff'd,* 168 F.3d 211 (5th Cir.1999). In other words, "[i]nasmuch as the administrator made the legally correct interpretation, [the court is] not compelled to proceed to ... determine whether the administrator's denial of benefits was an abuse of discretion because under a correct interpretation 'no abuse of discretion could have occurred.'" *Tolson,* 141 F.3d at 609 (quoting *Spacek v. Maritime Ass'n, ILA Pension Plan,* 134 F.3d 283, 292 (5th Cir.1998); *Wildbur,* 974 F.2d at 637–38).

 A review of the plan in this case demonstrates that it is straightforward in its language. Paragraph 4 of Section 8 of the 1969 Plan specifically provides that, absent contrary authorization by the Board of Directors, an employee's absence is generally considered a break in service and is thus not added to any period of later employment:

Any absence from the service without pay, other than absence during a period

of disability benefits, or leave of absence or temporary lay-off as defined in Paragraphs 5 and 6 of this Section, shall be considered as a break in the continuity of service unless the Board of Directors specifically authorizes the [Employee Benefits] Committee to consider such absence as a leave of absence, and if any person is re-employed after such a break in the continuity of his service, his term of employment shall be reckoned from the date of such re-employment.

On November 16, 1966, Western's Board of Directors passed the following resolution, which authorizes the EBC to permit credit for prior service if the employee works continuously for a five-year period after being reemployed:

WHEREAS, Paragraph 4 of Section 8 of the Plan for Employees' Pensions, Disability Benefits and Death Benefits of this Company provides that any absence from the service without pay, other than absence during a period of disability benefits, or leave of absence or temporary lay-off as defined in Paragraphs 5 and 6 of said Section, shall be considered as a break in the continuity of service unless this Board specifically authorizes the Employees' Benefit Committee to consider such absence as a leave of absence,

RESOLVED: that this Board hereby authorizes and directs the Employees' Benefit Committee to consider every break in the continuity of or absence from the service (other than absence during a period of disability benefits, or leave of absence or temporary lay-off as defined in Paragraphs 5 and 6 of said Section 8) as a leave of absence, upon completion by the employee, prior to the attaining of the age of sixty-five years, of five years of continuous service after the termination of the absence; provided, however, that this authorization shall not extend to any absence from the service which occurs before completion by the employee of six months of continuous service; and

RESOLVED FURTHER: that this Board hereby authorizes the Employees' Benefit Committee to consider as a leave of absence,

(a) Any absence from the service due to attendance at a school, college or other institution of learning;

(b) Any absence from the service not exceeding six months in duration;

provided that, in the opinion of said Committee, the facts are sufficient to warrant such action.

The 1969 Plan, therefore, did not authorize the plan administrator or the EBC to award Wise, who worked a mere six months during his second term of employment, with credit for the seventeen years he worked during his first term of employment. Moreover, the plan appears to have been given a uniform construction, as Wise has presented no competent evidence that Lucent treated similarly situated employees' claims differently. Furthermore, any variance from the 1969 Plan to provide pensions to individuals who did not work for at least a five-year period after reemployment indisputably would produce " 'substantial unanticipated costs to the Plan.' " *See Haubold,* 11 F.3d at 1340 (quoting *Batchelor,* 877 F.2d at 445). Under these circumstances, in light of the plain language of the 1969 Plan and the 1966 Board resolution, it is evident that DeCou and the EBC gave the plan its correct interpretation. *See id.* at 1341. In fact, Wise conceded as much in his response to Defendants' motion for summary judgment, where he admitted that the decisions of DeCou and the EBC "may have been technically correct." Accordingly, the decision to deny Wise retirement benefits cannot be viewed as an abuse of discretion. *See id.*

Wise argues, however, that DeCou and the EBC abused their discretion by failing to develop fully and consider the evidence. Specifically, Wise contends that DeCou and the EBC failed to locate a document which allegedly promised to give Wise, in

exchange for his agreement to become reemployed with Western for six months, deferred pension benefits based upon his seventeen years of prior employment. At deposition, Wise testified about the purported document and the alleged conversations which led to his reemployment with Western:

Q: What were the circumstances under which you left Maxson?

A: I got a phone call from my oldest son, and they [sic] told me that they wanted to talk to me back in Shreveport about coming back to work.

\* \* \* \* \* \*

Q: You're saying your son called you and said that—and told you what?

A: That they wanted to talk to me about coming back.

Q: "They" being?

A: "They" being Stan Schneider and Jack Banks. They was [sic] having a lot of problems.

\* \* \* \* \* \*

Q: After you received this telephone call from your son, what did you do?

A: I spent a weekend and come [sic] back to Shreveport. Made an appointment with—before I come [sic] back—to see Jack and Stanley and asked them what they wanted. And at that time they informed me that the—they was [sic] willing to bring me back if I would sign—agree—I'll put it that way—to a six-month contingency plan. That was in August of '69 when I come [sic] back.

Q: This was a meeting that occurred over a weekend, you say?

A: No. On a Monday. I guess it was on a Monday. I'm pretty sure.

Q: And that meeting occurred where?

A: In Jack's office.

\* \* \* \* \* \*

Q: Tell me as best as you can recall about what you said and they said at that meeting.

A: The way I remember it is they were talking about the deferred vested pension program, and I told them I wanted my service—if I come [sic] back, I want it bridged. And we got to talking about it and they come up with this six-month bridging program; if I would come back, they would go ahead and get the bridge in there. And I said, "Well, when you send off to the benefit service committee and get it approved and everything like that, I'll come back."

So, it was about, I don't know, two weeks or something like that, maybe three, I don't remember, they called me up and said it had been done. And I come back out there and they show me the paper and say, "Here it is. It's all been signed. You've been approved, and your service will be bridged." [sic]

\* \* \* \* \* \*

Q: Did you make any notes at the time of what was said in the meeting?

A: No.

Q: You said that once they got this bridging approved, once the paperwork was approved, then you would come back?

A: Yes. That's correct.

Q: What paperwork are you talking about?

A: It's called investigation of previous service.

Q: This is a document you're talking about?

A: Yes.

Q: Do you have this document?

\* \* \* \* \* \*

A: No.

Q: Did you ever have it?

A: No.

Q: How do you know it existed?

A: They showed it to me.

Q: They showed you a piece of paper?

A: Yes.

Q: What did it look like?

A: Just an official document. "Western Electric" written all over it, you know. I—

Q: Do you recall what the words were on the document?

\* \* \* \* \* \*

A: No.

Q: What was your understanding after this meeting with Mr. Banks and Mr. Schneider of your right to a deferred service pension?

A: Rate was never discussed. That's one thing. I mean, it wasn't their understanding—it wasn't my understanding. It was just that the service, my prior service of 17 years, would be bridged if I come [sic] back to work and six months in it. And that was contingency [sic]. If I worked six months, it would be bridged. And I can't tell you the secretary's name who signed it, but I'm sure it was official.

█ In essence, Wise now presents the court with a "sympathetic, estoppel-based argument" seeking to enforce an alleged oral promise by former management. *See, e.g., Degan v. Ford Motor Co.,* 869 F.2d 889, 895 (5th Cir.1989). ERISA, however, "expressly requires that '[e]very employee benefit plan shall be established and maintained pursuant to a written instrument.'" *Id.* (quoting 29 U.S.C. § 1102(a)(1)). ERISA also mandates any modifications to the benefit plan be in writing. *See id.* Thus, estoppel-based arguments are "not cognizable under ERISA in suits seeking to enforce rights to benefits based on purported oral modifications of plan terms." *Weir v. Federal Asset Disposition Ass'n,* 123 F.3d 281, 289–90 (5th Cir.1997); *see Cefalu v. B.F. Goodrich Co.,* 871 F.2d 1290, 1297 (5th Cir.1989); *Degan,* 869 F.2d at 895.

While Defendants had a duty to cause reasonably available evidence to be developed and considered in the decision-making process, the record indicates that they fulfilled their obligation in this regard. *See Alcorn,* 991 F.Supp. at 616 (citing *Toland v. McCarthy,* 499 F.Supp. 1183, 1190 (D.Mass.1980)); *see also Rigby v. Bayer Corp.,* 933 F.Supp. 628, 634 (E.D.Tex. 1996). DeCou's unrefuted affidavit reflects that she considered, and attempted to gather evidence to substantiate, Wise's claim that he was promised credit for his past service after working an additional six months:

> In making a determination on Mr. Wise's claim for pension benefits, I instigated a search for all employment records pertaining to Mr. Wise. I have personally reviewed the results of that search. There are no records reflecting that the Western Electric Employees' Benefit Committee, Board of Directors, or anyone else ever decided that Mr. Wise would be credited for his past service with Western Electric if he returned to work for a period of six months. Such a decision would have contravened the November 16, 1966 Board of Directors resolution that after a break in service, an employee who returned to employment with Western Electric would be credited with past service after accumulating five years of continuous service.

Moreover, in her August 15, 1997, letter to Wise, DeCou explained Lucent's document retention policy and asked that Wise submit, for her review, any documents which supported his claim for benefits:

> As explained in my letter of June 25, 1997, at the time you left the payroll of Western Electric Co. on February 13, 1970, you did not meet the requirements for eligibility to a deferred service pension under the then current Plan provisions. If you have any additional documentation in your possession to support your contention that you were eligible to [sic] a deferred service pension, we encourage you to submit same for review. In response to your request for a copy of all your employee files, please be advised that we have conducted an ex-

haustive search of Company records and have been unable to locate any records other than the copy of your company service record which I forwarded to you on July 10, 1997. You should be aware that the law does not require the Company to retain personnel files for employees who left the payroll in 1970.

Despite this opportunity to present evidence to bolster his position, the record reflects that Wise failed to produce any supporting documentation. At deposition, Wise admitted that he could not offer any evidence of Schneider and Banks's alleged promise to guarantee his eligibility for retirement benefits after a six-month employment term. Moreover, Wise conceded he never read the document he now contends memorialized the guarantee. In fact, beyond his allegation that the words "Western Electric" were "written all over" the paper, Wise cannot recall any specific language of the purported document. Furthermore, there is no indication that Wise attempted to depose or to obtain affidavits from Banks or Schneider confirming his version of the events or attesting to the existence of a document verifying his eligibility for retirement benefits. In this situation, to accept Wise's unsubstantiated claim "would mean presenting retirement plan administrators with claims for payment from individuals, otherwise ineligible, who were parties to oral agreements that ... have lain unsuspected and inert for years. That prospect would threaten the stability and solvency of many plans upon which so many other employees are dependent." *See Degan,* 869 F.2d at 895.

Here, the record reflects that DeCou and the EBC gave a full and fair consideration to the reasonably available evidence and rendered decisions that comport with the explicit provisions of the 1969 Plan as well as the 1966 Board resolution. Their actions are supported by substantial evidence and cannot be deemed arbitrary or capricious, as any other interpretation would contravene the express language of the Board resolution requiring five additional years of continuous service after a period of absence for the vesting of retirement benefits. Therefore, Defendants are entitled to summary judgment on Wise's claim for benefits under ERISA.

### C. State Law Claims

#### 1. ERISA Preemption

Next, Defendants contend that Wise's state law claims for breach of contract and fraud fail as a matter of law because they are preempted by ERISA.

■ The Supremacy Clause of the United States Constitution empowers Congress to enact laws that supersede state law by means of an express provision in a federal statute, by implication, or by creating a direct conflict between federal and state law. *See* U.S. CONST. art. VI; *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 654, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995). "ERISA's express pre-emption clause states that the Act 'shall supersede any and all State laws insofar as they may now or hereafter relate to an employee benefit plan ....'" *Boggs v. Boggs,* 520 U.S. 833, 841, 117 S.Ct. 1754, 138 L.Ed.2d 45 (1997) (quoting 29 U.S.C. § 1144(a)); *see Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 45, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987); *Dowden,* 126 F.3d at 643; *Nickel v. Estate of Estes,* 122 F.3d 294, 297 (5th Cir.1997). " 'State law' includes all laws, decisions, rules, regulations, or other State action having the effect of law, of any State." 29 U.S.C. § 1144(c).

■ Courts have noted that the ERISA preemption provision is "deliberately expansive," has a "broad scope," an "expansive sweep," and is "conspicuous for its breadth." *See California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.,* 519 U.S. 316, 324, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997); *District of Columbia v. Greater Washington Bd. of Trade,* 506 U.S. 125, 129, 113 S.Ct. 580, 121

L.Ed.2d 513 (1992); *Morales v. Trans World Airlines,* 504 U.S. 374, 383–84, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992); *FMC Corp. v. Holliday,* 498 U.S. 52, 58, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990); *Pilot Life Ins. Co.,* 481 U.S. at 45–46, 107 S.Ct. 1549; *Dowden,* 126 F.3d at 643; *Nickel,* 122 F.3d at 297. Thus, the words "relate to" are construed in their broadest sense. *See Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 98, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983); *Vega v. National Life Ins. Servs., Inc.,* 145 F.3d 673, 675 (5th Cir.1998); *E-Systems, Inc. v. Pogue,* 929 F.2d 1100, 1103 (5th Cir.), *cert. denied,* 502 U.S. 981, 112 S.Ct. 585, 116 L.Ed.2d 610 (1991). "[A] state law 'relates to' an employee benefit plan, and is pre-empted by ERISA, 'if it has a connection with, or reference to, such a plan.'" *Morales,* 504 U.S. at 384, 112 S.Ct. 2031 (quoting *Shaw,* 463 U.S. at 97, 103 S.Ct. 2890); *accord Travelers Ins. Co.,* 514 U.S. at 656, 115 S.Ct. 1671; *Greater Washington Bd. of Trade,* 506 U.S. at 129, 113 S.Ct. 580; *Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 139, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990); *Vega,* 145 F.3d at 675; *Dowden,* 126 F.3d at 643; *Kramer v. Smith Barney,* 80 F.3d 1080, 1083 (5th Cir.1996).

■ "This sweeping pre-emption of state law is consistent with Congress's decision to create a comprehensive, uniform federal scheme for the regulation of employee benefit plans." *Corcoran v. United HealthCare, Inc.,* 965 F.2d 1321, 1328 (5th Cir.), *cert. denied,* 506 U.S. 1033, 113 S.Ct. 812, 121 L.Ed.2d 684 (1992). ERISA pre-emption is designed to protect plan participants by eliminating the threat of inconsistent state and local regulations and to standardize the laws to permit the nationally uniform administration of employee benefit plans. *See Ingersoll–Rand Co.,* 498 U.S. at 138, 111 S.Ct. 478; *Fort Halifax Packing Co. Inc. v. Coyne,* 482 U.S. 1, 10–11, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987); *Texas Life, Accident, Health & Hosp. Serv. Ins. Guar. Ass'n v. Gaylord Entertainment Co.,* 105 F.3d 210, 217 (5th Cir.),

*cert. dismissed,* 521 U.S. 1113, 117 S.Ct. 2501, 138 L.Ed.2d 1006 (1997); *Peckham v. Gem State. Mut.,* 964 F.2d 1043, 1051 (10th Cir.1992). In enacting the preemption provision of ERISA, Congress sought to

> ensure that plans and plan sponsors would be subject to a uniform body of benefit law; the goal was to minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government.

*Ingersoll–Rand Co.,* 498 U.S. at 139, 111 S.Ct. 478; *accord Singer v. Black & Decker Corp.,* 964 F.2d 1449, 1452 (4th Cir. 1992). Therefore, ERISA may preempt a related state law even if the state law is not specifically intended to regulate ERISA-governed plans. *See Ingersoll–Rand Co.,* 498 U.S. at 139, 111 S.Ct. 478; *Nickel,* 122 F.3d at 297; *see also Boggs,* 520 U.S. at 844, 117 S.Ct. 1754; *First Nat'l Life Ins. Co. v. Sunshine–Jr. Food Stores, Inc.,* 960 F.2d 1546, 1549 (11th Cir.1992), *cert. denied,* 506 U.S. 1079, 113 S.Ct. 1045, 122 L.Ed.2d 354 (1993).

■ "[W]here a claim relates to an employee benefit plan governed by ERISA and [is] 'based upon state law of general application and not a law regulating insurance,' the state law cause of action is preempted by ERISA." *Cypress Fairbanks Med. Ctr., Inc. v. Pan–American Life Ins. Co.,* 110 F.3d 280, 284 (5th Cir.), *cert. denied,* 522 U.S. 862, 118 S.Ct. 167, 139 L.Ed.2d 110 (1997); *see Hermann Hosp. v. MEBA Med. & Benefits Plan ("Hermann I"),* 845 F.2d 1286, 1290 (5th Cir.1988). Preemption does not occur, however, "if the state law has only a tenuous, remote, or peripheral connection with covered plans, … as is the case with many laws of general applicability." *Greater Washington Bd. of Trade,* 506 U.S. at 130 n. 1, 113 S.Ct. 580 (citations and internal quotations omitted); *Operating Eng'rs Health & Welfare Trust Fund v. JWJ Contracting Co.,* 135 F.3d 671, 677 (9th Cir.1998). In determining whether a law is preempted, courts must look to the ob-

jectives of ERISA and the nature of the effect of state law on ERISA plans. *See Dillingham Constr.,* 519 U.S. at 324, 117 S.Ct. 832; *Travelers Ins. Co.,* 514 U.S. at 656, 115 S.Ct. 1671; *JWJ Contracting Co.,* 135 F.3d at 678.

"ERISA preempts a state law claim 'if (1) the state law claim addresses an area of exclusive federal concern, such as the right to receive benefits under the terms of an ERISA plan; and (2) the claim directly affects the relationship between the traditional ERISA entities—the employer, the plan and its fiduciaries, and the participants and beneficiaries.'" *Smith v. Texas Children's Hosp.,* 84 F.3d 152, 155 (5th Cir.1996) (quoting *Hubbard v. Blue Cross & Blue Shield Ass'n,* 42 F.3d 942, 945 (5th Cir.), *cert. denied,* 515 U.S. 1122, 115 S.Ct. 2276, 132 L.Ed.2d 280 (1995)); *accord McNeil v. Time Ins. Co.,* 205 F.3d 179, 191 (5th Cir.2000); *Dial v. NFL Player Supplemental Disability Plan,* 174 F.3d 606, 610–11 (5th Cir.1999); *Cypress Fairbanks Med. Ctr.,* 110 F.3d at 283; *Hook v. Morrison Milling Co.,* 38 F.3d 776, 781 (5th Cir.1994); *Memorial Hosp. Sys. v. Northbrook Life Ins. Co.,* 904 F.2d 236, 245 (5th Cir.1990). A suit by a participant or beneficiary to recover benefits from a covered plan falls directly within the civil enforcement provision of ERISA, which provides an exclusive federal cause of action for the resolution of such disputes. *See Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 62–63, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987) (citing *Pilot Life Ins. Co.,* 481 U.S. at 56, 107 S.Ct. 1549). " 'It is clear that ERISA preempts a state law cause of action brought by an ERISA plan participant or beneficiary alleging improper processing of a claim for plan benefits.'" *Dowden,* 126 F.3d at 643 (quoting *Memorial Hosp. Sys.,* 904 F.2d at 245 (citing *Pilot Life Ins. Co.,* 481 U.S. at 48, 107 S.Ct. 1549)). "In short, when beneficiaries seek to recover benefits from a plan covered by ERISA, their exclusive remedy is provided by ERISA, in 29 U.S.C.

§ 1132(a)(1)(B)." *Hansen v. Continental Ins. Co.,* 940 F.2d 971, 979 (5th Cir.1991).

Accordingly, the Fifth Circuit has found claims brought under state law asserting a variety of common law and statutory causes of action arising from the failure to pay or misrepresentations concerning benefits available under an ERISA plan to be preempted by ERISA—breach of contract, negligence, fraud, negligent misrepresentation, breach of fiduciary duty, breach of the duty of good faith and fair dealing, equitable estoppel, intentional infliction of emotional distress, violation of the Texas Deceptive Trade Practices Act, and violation of Article 21.21 of the Texas Insurance Code. *See McNeil,* 205 F.3d at 191; *Kramer,* 80 F.3d at 1083; *McDonald v. Provident Indem. Life Ins. Co.,* 60 F.3d 234, 238 (5th Cir. 1995), *cert. denied,* 516 U.S. 1174, 116 S.Ct. 1267, 134 L.Ed.2d 214 (1996); *Hubbard,* 42 F.3d at 946; *Hogan v. Kraft Foods,* 969 F.2d 142, 144 (5th Cir.1992); *Hermann Hosp. v. MEBA Med. & Benefits Plan ("Hermann II"),* 959 F.2d 569, 577–78 (5th Cir.1992); *Hansen,* 940 F.2d at 979; *Ramirez v. Inter–Continental Hotels,* 890 F.2d 760, 763–64 (5th Cir.1989); *Boren v. NL Indus., Inc.,* 889 F.2d 1463, 1465–66 (5th Cir.1989), *cert. denied,* 497 U.S. 1029, 110 S.Ct. 3283, 111 L.Ed.2d 792 (1990). Preemption applies when the essence of a claim seeks the recovery of benefits or otherwise relates to an employee benefit plan, even when brought against a third-party, non-fiduciary. *See Heimann v. National Elevator Indus. Pension Fund,* 187 F.3d 493, 514 (5th Cir. 1999); *Hubbard,* 42 F.3d at 946; *Corcoran,* 965 F.2d at 1334; *Consolidated Beef Indus., Inc. v. New York Life Ins. Co.,* 949 F.2d 960, 964 (8th Cir.1991), *cert. denied,* 503 U.S. 985, 112 S.Ct. 1670, 118 L.Ed.2d 390 (1992); *Gibson v. Prudential Ins. Co. of Am.,* 915 F.2d 414, 418 (9th Cir.1990); *Howard v. Parisian, Inc.,* 807 F.2d 1560, 1564 (11th Cir.1987).

In response to Defendants' claim that his breach of contract and fraud

claims are preempted by ERISA, Wise argues:

> Without addressing the merit of Defendants' contention that ERISA has created a "safe haven" for perpetrators of fraud and those who wilfully breach contracts, other than to say that if this is true all a wrongdoing [sic] need do to escape liability is to make absolutely sure his or her fraudulent representations promise ERISA type benefits as part of the false inducements. ERISA cannot preempt claims arising before its effective date.

> In any event, even if this were the state of the law, it has no application to this case. The acts complained of all occurred before the effective date of ERISA. Defendants cite no authority that ERISA preempts acts of Breach of Contract or Fraud occurring in 1970. Plaintiff's counsel is not aware of any such authority.

Thus, Wise contends that ERISA preemption is inapplicable in this case because the alleged acts giving rise to his claims occurred prior to ERISA's effective date. *See Petrolite Corp. v. Barnhouse,* 812 S.W.2d 341, 343 (Tex.App.—Corpus Christi 1991, no writ). Although he does not cite the statute, it is apparent that Wise is relying on an exception to ERISA's preemption provision, which provides that the Act "shall not apply with respect to any cause of action which arose, or any act or omission which occurred, before January 1, 1975." 29 U.S.C. § 1144(b)(1). This exception, however, is not operative in the instant case.

The application of ERISA depends upon: "1) a determination of the time the cause of action arose, and 2) a determination of the time of acts or omissions." *Rodriguez v. MEBA Pension Trust,* 872 F.2d 69, 71 (4th Cir.), *cert. denied,* 493 U.S. 872, 110 S.Ct. 202, 107 L.Ed.2d 155 (1989) (citing *Tanzillo v. Local Union 617,* 769 F.2d 140, 143–44 (3d Cir.1985); *Menhorn v. Firestone Tire & Rubber Co.,* 738 F.2d 1496, 1500–01 (9th Cir.1984); *Quinn v. Country Club Soda Co., Inc.,* 639 F.2d 838, 840 (1st Cir.1981)); *see Degan,* 869 F.2d at 894; *Petrolite Corp.,* 812 S.W.2d at 343. With regard to the date Wise's cause of action arose, it is well settled that an "ERISA cause of action accrues when a request for benefits is denied." *Hogan,* 969 F.2d at 145; *Simmons v. Willcox,* 911 F.2d 1077, 1081 (5th Cir.1990); *St. Julian v. Trustees of Agreement of Trust for Maritime Ass'n—I.L.A. Pension Plan,* 5 F.Supp.2d 469, 472 (S.D.Tex.1998); *Petrolite Corp.,* 812 S.W.2d at 344. Here, the record indicates that Wise first inquired about his retirement benefits in 1996 or 1997. Thereafter, a series of letters were exchanged between the parties and, by letter dated March 19, 1998, the EBC formally rejected Wise's claim. "Thus, it is clear that [Wise] was formally denied benefits after ERISA's effective date." *Id.*

It is also apparent that the relevant "acts or omissions" in this case occurred post-ERISA. The Fifth Circuit interprets the phrase "acts or omissions" to require ERISA preemption in cases involving pre-ERISA conduct when benefits are denied post-ERISA. *See id.* In *Degan,* under facts similar to this case, the Fifth Circuit held that an employee could not recover benefits based upon "oral assurances" that were made by his employer pre-ERISA. *See* 869 F.2d at 895. Degan, like Wise, sought to recover benefits defined in an ERISA plan, benefits he was denied because he relied to his detriment on alleged misrepresentations by his employer. *See id.* at 892. The appellate court affirmed the district court's rejection of Degan's contention that pre-ERISA oral statements were "acts or omissions" which precluded ERISA preemption. *See id.* at 894–95.

Here, Wise argues that the relevant "acts or omissions" were the oral assurances he allegedly received from Banks and Schneider that he would receive credit for his previous seventeen years of employment and their alleged presentation of

a document that purportedly allowed for the bridging of his prior service if he were employed for an additional six months. He claims that these events occurred during a meeting in 1970 and, thus, his breach of contract and fraud claims are not preempted by ERISA. "On this score, *Degan* is particularly damaging to [Wise's] position, because in *Degan* [the Fifth Circuit] affirmed dismissal of the state law breach of contract claim despite [its] explicit recognition that Degan's oral contract and promissory estoppel claims were " 'not cognizable in suits to enforce rights to pension benefits' under ERISA." " *See Lee v. E.I. DuPont de Nemours & Co.*, 894 F.2d 755, 757 (5th Cir.1990) (quoting *Degan*, 869 F.2d at 895). The Fifth Circuit held in *Degan* that "ERISA preempted such state law claims, despite the fact that ERISA itself provided no remedy for the alleged misrepresentations." *Lee*, 894 F.2d at 757; *see Hansen*, 940 F.2d at 979; *Degan*, 869 F.2d at 895. "Describing the employer's misrepresentation as a 'betrayal without remedy,' [the Fifth Circuit in *Degan* ] nonetheless concluded that the congressional policy in favor of exclusively federal regulation of pension plans required the result, and [the appellate court] therefore held the state law claims were preempted under section 1144." *Lee*, 894 F.2d at 757; *see Degan*, 869 F.2d at 895. The court observed that the preemption provisions of ERISA are "deliberately expansive" and designed to establish pension plan regulation as an exclusively federal concern. *See Lee*, 894 F.2d at 757; *see also Pilot Life Ins. Co.*, 481 U.S. at 45–46, 107 S.Ct. 1549.

Thus, it is evident that Wise cannot rely on any alleged oral assurances he received in 1970 to avoid ERISA's preemptive effect. Wise's state law claims for breach of contract and fraud, therefore, are preempted, and summary judgment is warranted as to those claims.

## III. *Conclusion*

DeCou's and the EBC's denials of pension benefits to Wise were based on a proper interpretation of the applicable pension plan in light of the reasonably available evidence. Consequently, Wise cannot demonstrate a genuine issue of material fact with regard to whether Defendants abused their discretion when they found him ineligible to receive benefits. In addition, Wise's state law claims for breach of contract and fraud are preempted by ERISA. Hence, Wise has failed to present a claim that would entitle him to relief, and Defendants are entitled to judgment as a matter of law.

Accordingly, Defendants Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED.